UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRENNEN HYATT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIVINT SOLAR, INC., THE BLACKSTONE GROUP L.P., GREGORY S. BUTTERFIELD, DANA C. RUSSELL, DAVID F. D'ALESSANDRO, ALEX J. DUNN, BRUCE McEVOY, TODD R. PEDERSEN, JOSEPH F. TRUSTEY, PETER F. WALLACE, JOSEPH S. TIBBETTS, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., and BLACKSTONE ADVISORY PARTNERS L.P.,<br><br>Defendants. | Case No. 1:14-cv-09283-KBF<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| THOMAS LIMA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>VIVINT SOLAR, INC., THE BLACKSTONE GROUP L.P., GREGORY S. BUTTERFIELD, DANA C. RUSSELL, DAVID F. D'ALESSANDRO, ALEX J. DUNN, BRUCE McEVOY, TODD R. PEDERSEN, JOSEPH F. TRUSTEY, PETER F. WALLACE, JOSEPH S. TIBBETTS, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE | Case No. 1:14-cv-09709-KBF |

SECURITIES (USA) LLC, CITIGROUP
GLOBAL MARKETS INC., DEUTSCHE
BANK SECURITIES INC., MORGAN
STANLEY & CO. LLC, BARCLAYS
CAPITAL INC., and BLACKSTONE
ADVISORY PARTNERS L.P.,

Defendants.

## TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................................................1

JURISDICTION AND VENUE ..............................................................................................4

PARTIES ..................................................................................................................................5

SUBSTANTIVE ALLEGATIONS ..........................................................................................8

    A.    Vivint Solar's Investment Fund Accounting and Net Losses ......................................10

    B.    Vivint Solar's Long-Term Leases and Power Purchase Agreements ...........................20

    C.    Market Saturation Impacting Vivint Solar's Operations in Hawaii .............................25

CLASS ACTION ALLEGATIONS .......................................................................................31

COUNT I .................................................................................................................................32

COUNT II ................................................................................................................................34

COUNT III ..............................................................................................................................35

PRAYER FOR RELIEF ..........................................................................................................36

JURY TRIAL DEMANDED ...................................................................................................37

Lead Plaintiff Robby Shawn Stadnick ("Plaintiff") alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Vivint Solar, Inc. ("Vivint Solar" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Vivint Solar provides residential homeowners the opportunity to save 15% to 30% off their electricity bills.  Using a direct sales model, Vivint Solar's sales force solicits customers on a door-to-door basis, offering solar panel energy systems for little-to-no money upfront through long-term leases or power purchase agreements.  Homeowners who accept the offer enter into these agreements—which last 20 years—and typically benefit from the electricity produced from the solar energy systems once installed and operational.

2.      The Company benefits as well.  Due to the fact that these long-term arrangements allow Vivint Solar to retain *ownership* of the solar energy systems, the Company is able to receive a number of local, state, and federal benefits associated with solar energy investments, including but not limited to investment tax credits and accelerated tax depreciation.  These benefits (referred to as tax equity investments) along with the homeowners' monthly payments (referred to as customer receivables) are then bundled together and securitized.  This is how Vivint Solar makes its money—through the securitization of its tax equity and customer receivables.

1

3.      Vivint Solar provided investors with an overview of its business model in its Registration Statement[1] in advance of the Company's October 1, 2014 initial public offering (the "IPO").  The Registration Statement presented Vivint Solar as a source of highly predictable and stable cash flows based on a 20-year stream of payments from creditworthy customers under long-term contracts.  Vivint Solar noted its history of positive and growing earnings-per-share and the opportunities in the market for solar energy.  This presentation was highly misleading.

4.      In fact, Vivint Solar presents a highly risky and volatile income stream with the only certainty being substantial operating losses into the foreseeable future.  In valuing its customer contracts, Vivint Solar assumes a low default rate and high renewal rate for its customers, even though solar energy is a dynamic industry with a high degree of product development so that the solar energy systems being sold in 2014 by Vivint Solar will likely be obsolete long before the end of the 20-year term of the customer contract.  Vivint Solar was also facing increasing difficulties leasing its solar energy systems as customers began to increasingly look to purchase the system themselves so as to be able to claim the related federal and state tax incentives.  This increased the cost and expense of identifying and signing new customers.  Vivint Solar offered no option for customers to buy their own solar energy system.  Vivint Solar was also confronting heightened regulation and market saturation conditions in Hawaii, a geographic territory which accounted for 15% of the Company's installations.  Finally, Vivint Solar was experiencing increasing difficulties and delays in completing installations of its solar energy systems.

---

[1] "Registration Statement" refers collectively to the Company's Registration Statement on Form S-1 filed with the SEC on August 26, 2014, Amendment No. 1 to the Registration Statement on Form S-1/A filed with the SEC on September 19, 2014, Amendment No. 2 to the Registration Statement on Form S-1/A filed with the SEC on September 26, 2014, and the Prospectus on Form 424B4 filed with the SEC on October 1, 2014.  Citations to "Registration Statement at __" refers to pages within the Prospectus on Form 424B4.

5.     Vivint Solar was able to mask these trends because it was able to attribute all of its operating losses for a quarter to "non-controlling interests" in investment funds that it used to finance the solar energy systems it leased to its customers.  This attribution of losses to Vivint Solar's "non-controlling interests" converted operating losses of $56.4 million and $69.2 million for the year ended December 31, 2013 and six months ended June 30, 2014 to reported net income available to common stockholders of $5.6 million and $12.5 million, respectively.  This complex and opaque accounting sleight-of-hand meant it was impossible for investors to predict Vivint Solar's net income and earnings-per-share into the future.  At the time of the IPO, however, the growth in new customers signed together with the increasing delays experienced in installation meant that there would be a dramatic reduction in the proportion of Vivint Solar's operating losses that could be attributed to the investment funds for the three months ended September 30, 2014.  It was thus inevitable that Vivint Solar would experience a significant net loss during the three months ended September 30, 2014.  This fact was not disclosed to Vivint Solar's investors in the Registration Statement dated September 30, 2014.

6.     On November 10, 2014, it became evident that the Registration Statement's description of the Company's operations and finances were materially misleading and/or inaccurate.  After the market closed, Vivint Solar issued a press release announcing its earnings for the third quarter of fiscal 2014.  The press release indicated that Vivint Solar had suffered a "Non-GAAP Earnings Before Non-Controlling Interests and Redeemable Non-Controlling Interests per Share" loss of ($0.66) per share.  Analysts, meanwhile, had been projecting a loss of only ($0.27) per share.  In other words, *Vivint Solar missed analyst projections by 143%*.  The press release also indicated that the Company would be lowering its guidance for the fourth quarter, signaling to the market that growth would be slowing.

3

7.      In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.  Following the release of the Company's quarterly report on Form 10-Q, Vivint Solar stock declined even further from $12.33 per share on November 12, 2014 to $11.70 per share on November 13, 2014, a decrease of $0.63 per share (approximately 5%).

8.      Plaintiff brings this suit to recover for the damages caused by Defendants'[2] violations of the Securities Act of 1933 (the "Securities Act").

## <u>JURISDICTION AND VENUE</u>

9.      The claims asserted herein arise under and pursuant to Sections 11, 12(a), and 15 of the Securities Act (15 U.S.C. §§ 77k(a), 77l(a), and 77o(a)).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

11.      Venue is proper in this District pursuant to Section 22 of the Securities Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged in this Complaint occurred in this District.

12.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

---

[2] "Defendants" refers collectively to Vivint Solar, Blackstone, the Individual Defendants, and the Underwriter Defendants, as defined below.

## PARTIES

13.     Plaintiff purchased Vivint Solar common stock pursuant and/or traceable to the IPO, as set forth in the certification submitted in support of Plaintiff's motion for lead plaintiff and incorporated by reference herein, and was damaged thereby.

14.     Defendant Vivint Solar is a residential solar energy unit installer that leases solar energy systems to residential homeowners. Vivint Solar operates in Arizona, California, Hawaii, Maryland, Massachusetts, New Jersey, and New York.  As of June 30, 2014, approximately 53% and 15% of total installations were in California and Hawaii, respectively.  Of the Company's 37 offices, 21 were located in these states.  (Registration Statement at 28, 135.)  Following the IPO, Vivint Solar stock traded on the New York Stock Exchange under the ticker symbol "VSLR".

15.     Defendant The Blackstone Group L.P. ("Blackstone"), based in New York City, is an investment firm and the world's largest alternative asset manager.  Blackstone's alternative asset management business includes the management of corporate private equity funds, real estate funds, hedge fund solutions, credit oriented funds and closed-end mutual funds. Blackstone also provides various financial advisory services, including financial and strategic advisory, restructuring and reorganization advisory and fund placement services.  Through its different investment businesses, as of June 30, 2014, Blackstone had assets under management of approximately $279 billion.

16.     By virtue of its 97% pre-IPO and 78% post-IPO ownership interest of Vivint Solar common stock, Defendant Blackstone controls Vivint Solar.  It owned or controlled through its affiliate 313 Acquisition LLC 97% of Vivint Solar's common stock and 78% of Vivint Solar's common stock after the IPO.  Through 313 Acquisition LLC, Blackstone nominated two directors to Vivint Solar's Board of Directors and another director is a current

5

Blackstone managing director.  Pursuant to a Support and Services Agreement, Blackstone Management Partners LLC, an affiliate of Blackstone provides support services and due diligence services.  In addition, two affiliates of Blackstone are investors in three investment funds organized by Vivint Solar.  In the Registration Statement, Vivint Solar warns investors that Blackstone and its affiliates control it and Blackstone's interests may conflict with Vivint Solar and its stockholders.

17.     Defendant Gregory S. Butterfield ("Butterfield") is, and was at the time of the IPO, Chief Executive Officer ("CEO"), President and a director of Vivint.

18.     Defendant Dana C. Russell ("Russell") is, and was at the time of the IPO, Chief Financial Officer ("CFO") of Vivint.

19.     Defendants David F. D'Alessandro ("D'Alessandro"), Alex J. Dunn ("Dunn"), Bruce McEvoy ("McEvoy"), Todd R. Pedersen ("Pedersen"), Joseph F. Trustey ("Trustey"), Peter F. Wallace ("Wallace"), and Joseph S. Tibbetts ("Tibbetts") are, and were at the time of the IPO, directors of Vivint.

20.     Defendants Butterfield, Russell, D'Alessandro, Dunn, McEvoy, Pedersen, Trustey, Wallace, and Tibbetts are referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement issued in connection with the IPO.

21.     Defendants Goldman, Sachs & Co. ("Goldman"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), and Blackstone Advisory Partners L.P. ("Blackstone Advisory Partners") (collectively, the "Underwriter Defendants") are financial services companies that acted as underwriters and joint

managers of Vivint's IPO, helping to draft and disseminate the offering documents. Each of the Underwriter Defendants maintains either their principal place of business or executive offices in this District.

22.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia,* in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $20 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Vivint stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Vivint, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Vivint that it would indemnify and hold them harmless from any liability under the federal securities laws. They also made certain that Vivint had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Vivint and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Vivint, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Vivint's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Vivint's lawyers, management and top executives and engaged in "drafting sessions" between at least May 2014 and October 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Vivint stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Vivint would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Vivint management and top executives, the Underwriter Defendants knew, or should have known, of Vivint's existing problems as detailed herein.

(e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

23.    Vivint Solar provides solar energy to residential homeowners.  For "little to no money upfront," Vivint Solar will install a solar energy system on a customer's roof that is assured to provide the customer with savings of 15% to 30% relative to utility-generated electricity.  (Registration Statement at 124.)

24.    In exchange, Vivint Solar's customers agree to enter into long-term leases or power purchase agreements.  Both the long-term leases and power purchase agreements (often referred to as PPAs) have 20-year terms.  While differences exist between the leases and the power purchase agreements (relating to how the customer receives the solar energy and from whom), both are intended to accomplish several specific objectives for the Company.  First, the leases and power purchase agreements require Vivint Solar's customers to make monthly payments throughout the 20-year term, which are intended to provide the Company with a secure stream of revenue.  Second, by retaining ownership of the solar energy systems, Vivint Solar is able to qualify for and benefit from investment tax credits (also referred to as ITCs), accelerated tax depreciation, and other incentives from federal, state, and local governments.  (Registration Statement at 124.)

25.    Vivint Solar's business strategy is almost entirely devoted to monetizing the benefits it receives through the long-term leases and power purchase agreements.  Vivint Solar accomplishes this through complex securitization mechanisms involving a number of related investment funds.  As of September 17, 2014, Vivint Solar had raised 10 investment funds through which any number of financial investors had committed to invest significant amounts of

capital (the "Investment Funds").   Vivint Solar relies on this capital to fund its business operations, including the purchase, installation, and maintenance of its solar energy systems. (Registration Statement at 124-25.)

26.     Vivint Solar's access to capital through the Investment Funds was critical, given its "little to no money upfront" business plan.  Indeed, Vivint Solar's very first risk factor within the Registration Statement's "RISK FACTOR" section stressed the importance of Vivint Solar's continued access to capital: "If we are unable to establish new investment funds when needed, or upon desirable terms, to enable our customers' access to our solar energy systems with little to no upfront cost to them, we may be unable to finance installation of our customers' systems or our cost of capital could increase, either of which would have a material adverse effect on our business, financial condition, results of operations and prospects."  (Registration Statement at 19.)  Because Vivint Solar offered only long-term leases and power purchase agreements (as opposed to outright purchases and/or financing options), Vivint Solar was resigned to collecting its solar energy system revenue on a monthly basis over the course of 20 years.  Consequently, the Company required capital to fund its operations while its long-term payment stream matured.

27.     Notwithstanding the Investment Funds, Vivint Solar sought additional capital from the public equity markets.  Beginning in May 2014, Vivint Solar submitted a draft registration statement to the SEC, which the Company then revised a number of times in response to SEC correspondence.  On September 30, 2014, the SEC declared the Registration Statement effective, and on October 1, 2014, the Company held its IPO.  Vivint Solar sold 20,600,000 shares of its common stock at $16.00 per share, resulting in net proceeds of $300.8 million after deducting underwriting discounts and commissions and $8.6 million in offering expenses.

28.     Unbeknownst to the investing public, the Registration Statement upon which Vivint Solar stockholders relied contained materially incorrect statements and/or neglected to include material information concerning the Company's operations.  This information, which is discussed in detail below, should have been included in the Registration Statement.

**A.     Vivint Solar's Investment Fund Accounting and Net Losses**

29.     The first category of information that Vivint Solar either inadvertently or negligently omitted from the Registration Statement relates to the Company's Investment Funds and how the Company's accounting tactics obscured the Company's net losses.

30.     As of September 17, 2014, Vivint Solar had raised ten Investment Funds.  Six of the Investment Funds were organized as "partnership" structures, while the remaining four were organized as "inverted lease" structures.  (Registration Statement at 74.)  In the "partnership" structure, the Investment Fund acquires and then sells solar power directly to Vivint Solar's customers or directly leases the solar energy systems to the customers.  Similarly, in the "inverted lease" structure, the Company creates a multi-tiered investment vehicle comprised of two partnership entities that are designed to facilitate the pass-through of the tax benefits to the fund investors. (Registration Statement at 74-76.)

31.     Regardless of the fund structure, in both scenarios fund investors would contribute cash to the Investment Funds, which the Investment Funds would then use to buy Vivint Solar's solar energy systems, customer contracts, and associated rights (*e.g.*, incentives and tax credits).  In exchange, Vivint Solar would receive cash and/or equity interests from the Investment Funds.  Vivint Solar considered itself the primary beneficiary in these arrangements for accounting purposes and, as such, consolidated the assets and liabilities and operating results

of the "partnership" and "inverted lease" structures in the Company's consolidated financial statements.

32.     The consolidation of the Investment Funds' operations most directly impacted Vivant Solar's net income to stockholders.  Vivint Solar calculated net income (loss attributable) to stockholders by deducting from net loss the net loss attributable to its non-controlling interests in the Investment Funds.  In other words, the net loss attributable to the Investment Funds represented the Company's allocable share in the results of operations of the Investments Funds. (Registration Statement at 88.)

33.     Vivint Solar calculated its net loss attributable to the Investment Funds pursuant to "a balance sheet approach using the HLBV [Hypothetical Liquidation at Book Value] method. Under the HLBV method, the amounts of income and loss attributed to the [Investment Funds] in the consolidated statements of operations reflect[ed] changes in the amounts the fund investors would hypothetically receive at each balance sheet date under the liquidation provisions of the contractual agreements of these funds . . . ."  (Registration Statement at 88-89.)

34.     The Registration Statement identified three factors that impacted the Company's HLBV calculations and, in turn, the Company's net loss attributable to the Investment Funds. The **first** factor was the Investment Funds' "liquidation provisions," which determined how much income or loss would be attributed to the fund investors (as opposed to the Company). While the "liquidation provisions" were not uniform, each contained a term providing for the re-allocation of percentages between Vivint Solar and the fund investors.  Vivint Solar referred to these terms as "flip[s]" or "flip points," which in essence operated to "flip" the respective interests of Vivint Solar and the fund investors in the Investment Funds' operations. (Registration Statement at 89.)  Vivint Solar explained that, "[p]rior to the point at which the

11

allocation percentage flips, the investor is entitled to receive most of the value generated by the solar energy systems; afterwards, we are entitled to receive most of the value." (Registration Statement at 89.) In other words, Vivint Solar allowed its fund investors to receive the majority of the benefits being generated by the Investment Funds up until a certain point—the "flip point"—at which time Vivint Solar began receiving the benefits of the Investment Funds.

35.     The "flip points" for the Investment Funds depended, in part, upon whether the Investment Fund was structured as a "partnership" or an "inverted lease." For "partnerships," the "flip point" was "tied to the achievement of the fund investor's targeted rate of return." For "inverted leases," the "flip point" was "typically tied to the passage of a period of time that correspond[ed] to the expiration of the recapture period associated with [investment tax credits]." (Registration Statement at 89.)

36.     The **second** factor that impacted Vivint Solar's HLBV calculations and, in turn, the loss attributable to stockholders, was whether Vivint Solar had received cash from an Investment Fund in excess of the carrying value of the solar energy systems contributed to the Investment Fund. The cash Vivint Solar would receive from an Investment Fund would be an amount equal to the fair market value of the solar energy systems that the Investment Fund was purchasing from the Company. To the extent the fair market value was greater than the carrying value, Vivint Solar would consider the amount as an allocation of income. (Registration Statement at 90.)

37.     The **third** factor concerned the timing of an investor's cash contribution to an Investment Fund relative to the Company's sale of solar energy systems in return. Often times Vivint Solar was unable to immediately install the solar energy systems purchased by the fund investors; when this occurred, the solar energy systems would have a carrying value of zero. The

Investment Fund would in turn record a receivable (representing a claim to the solar energy systems if and when they were subsequently installed). The recognition of a receivable resulted in a decrease in the Investment Fund's equity, which appeared as a loss to the Investment Fund and its investors. However, when the solar energy systems were ultimately installed, the receivable would be eliminated, the Investment Fund's equity would be increased, and the loss would be eliminated. (Registration Statement at 90.)

38.     By way of employing this HLBV method of accounting for its Investment Funds, Vivint Solar's financials did not accurately convey the true state of the Company. According to the Registration Statement, Vivint Solar's business offered "[l]ong-term, highly visible, recurring cash flow." Vivint Solar's "customers typically sign 20-year contracts for solar electricity generated by the system owned by us and pay us directly over the term of their contracts. These customer contracts generate recurring customer payments." (Registration Statement at 125.) Vivint Solar noted that the average FICO score of its customers was 750, an indication of excellent credit. (Registration Statement at 133.)

39.     Vivint Solar's financial statements, as presented, matched this description of the business by showing a trend of stable and growing income and earnings-per-share. The financial statements in the Registration Statement showed positive net income for the quarters ended September 30, 2013, December 31, 2013, March 31, 2014, and June 30, 2014. Net income grew from $3,217,000 for the quarter ended December 31, 2013 to $5,493,000 for the quarter ended June 30, 2014. (Registration Statement at 99.) Vivint Solar also reported earnings-per-share of $0.09 for the year ended December 31, 2013 and $0.16 for the six months ended June 30, 2014. (Registration Statement at 16.) This presented an image of Vivint Solar as a growing, profitable business.

40.     This image was misleading because Vivint Solar was, in fact, incurring huge losses while it built solar energy systems and installed them with its customers.  Because Vivint Solar recognizes all the costs of building and installing a solar energy system but only receives payment over 20 years, it necessarily incurs a significant loss at the time the solar energy system is sold and installed.  Vivint Solar incurred operating losses of $56.4 million and $69.2 million for the year ended December 31, 2013 and six months ended June 30, 2014, respectively.

41.     Vivint Solar was able to avoid recognizing these huge losses because it attributed losses to the "non-controlling interests" in its Investment Funds.  As explained previously, Vivint Solar receives cash from its Investment Funds reflecting the fair market value of the solar energy system that covers all or substantially all of the costs it incurs to sell, build, and install the solar energy system.  The Investment Fund receives the solar energy system installed at the customer's home but only recognizes the historical cost of the system, an amount less than its fair market value.  The difference between the carrying value of the system and the fair market value received by Vivint Solar in cash reflects a loss that Vivint Solar attributes to the Investment Fund in its financial statements.  (Registration Statement at 89-90).

42.     Solar energy systems are not "purchased" by the Investment Funds from Vivint Solar until they have been built and installed at the customer location.  Therefore, any delay in installing a solar energy system means there is a delay in attributing to the Investment Fund the majority of the losses Vivint Solar has incurred.

43.     For the quarters preceding the IPO, Vivint Solar was able to install a sufficient amount of solar systems so as to be able to transfer the corresponding operating losses to the Investment Funds.  However, as the Company entered the third-quarter of 2014, it began

confronting increased delay times which resulted in the Company being saddled with the immense operating losses it had previously been able to transfer.

44. Former employees[3] of Vivint Solar confirm that the Company was not installing its solar energy systems on a timely basis. For example:

- Former Employee 1 was employed as a Vivint Solar Sales Manager in Los Angeles, California, from January 2014 through October 2014. FE 1 reported to Mike Schreiner and Chad Vogel, Vivint Solar District Managers. FE 1 was responsible for overseeing sales and installations in the Los Angeles market. FE 1 recalled that as the Company grew in size, it did not have sufficient time to train new hires. FE 1 left Vivint Solar in part because the Company was taking too long to install the solar panels he was selling. For example, installations in Torrence and Lomita, California, could take a few months to complete. FE 1 recalled that customers would cancel their contracts because the permitting process with local municipalities was taking too long. FE 1 estimated that he lost approximately 40% of FE 1's customers throughout his employ with the Company.

- Former Employee 2 was also based in Los Angeles, California. FE 2 was a Vivint Solar Account and Project Manager from March 2014 through October 2014. FE 2 reported to Michael Schreiber, Vivint Solar Area Sales Manager. FE 2 was responsible for generating sales leads and managing projects from application through installation. FE 2 estimated that he drew proposals for approximately 200 customers, only 40 to 50 of which were installed. FE 2 recalled that the panels were not being installed because of delays in obtaining proper permits. Further, with regard to the panels that were installed, they were not being installed properly. FE 2 estimated that half of the installations done in his area were done improperly during his tenure. According to FE 2, the technicians were inexperienced—for example, the technicians would drill holes in the wrong locations. Moreover, FE 2's office was trying to install between 10 and 15 systems per week. Between the delays in obtaining proper permits and the installation mistakes, there was an average lag time of approximately four months before the solar panels went "live."

- Former Employee 3 was a Vivint Solar Operations Manager from October 2012 through October 2014. FE 3 was responsible for the Inland Empire – San Bernardino County, California. FE 3 reported to Douglas Hatch, Vivint Solar Regional Manager. FE 3 was responsible for overseeing an installations team. FE 3 explained that installation delays occurred in part

---

[3] Plaintiff has withheld the names of certain former employees so as to avoid the risk of retaliation against the witness. The former employees are referred to as "Former Employee __" or "FE __".

15

because Vivint Solar switched mounting systems at the end of the second quarter of fiscal 2014.   According to FE 3, the new systems were problematic, which resulted in Vivint Solar having to make repairs on approximately 500 to 700 accounts.   The purpose of the repairs was to improve and/or fix the "grounding" mechanisms on the solar energy systems.

- Former Employee 4 was a Vivint Solar Electrical Apprentice/Lead Inspector from January 2014 through November 2014.  FE 4 was based in San Diego, California, and reported to Mike Espinosa, former Electrical Supervisor.   FE 4 was responsible for the electrical aspects of the installations.   FE 4 corroborated FE 3's recollections regarding the problematic mounting systems and the increased repairs.  During the third quarter of 2014, Vivint Solar switched to a different mounting system that involved a different electrical connection.   Around September 2014 and into October 2014, repairs began to increase above 3 to 4 per week, which in turn delayed new installations.

45.    Vivint Solar's installation delays materially impacted the Company's net income available to common stockholders.   As explained in the Registration Statement, Vivint Solar calculated net income available to common stockholders by deducting from net loss the net loss attributable to its non-controlling interests in the Investment Funds.  (Registration Statement at 88.)  This method of calculation impacted Vivint Solar's financials favorably, resulting in an extreme increase in net income in 2013 and netting even additional income (while avoiding a loss) during the first six months of 2014:



|  | Jan. 1, 2013 to June 30, 2013 | Jul. 1, 2013 to Dec. 31, 2013 | Jan. 1, 2014 to June 30, 2014 |
|---|---|---|---|
| Net Income Available to Common Stockholders: | ($20,434) | $26,072 | $12,534 |

(Registration Statement at 92.)

46.     Vivint Solar's favorable net income figures carried over to the Company's earnings per share figures, as the Company used net income available to common stockholders as the numerator in its earnings per share calculations.  (Registration Statement at F-61.)  For the same periods, Vivint Solar reported earnings-per-share figures of ($0.27), $0.35, and $0.17.

47.     These reported results obscured the trend that Vivint Solar was substantially increasing the number of systems it was selling and thus incurring higher installation costs associated with the increased sales, that sales costs were increasing due to the market trend away from leasing solar systems, and that Vivint Solar was experiencing increasing delays in installing the systems with customers and thus a delay in being able to attribute some of its losses to its Investment Funds.  These trends, which existed as of September 30, 2014, the date of the Registration Statement, meant that Vivint Solar would incur increasing operating losses for the three months ended September 30, 2014 and be unable to allocate as many losses to its Investment Funds as it had in prior quarters that were reported in the Registration Statement.

48.     Accordingly, as of September 30, 2014, and contrary to the trend of growing net income and positive earnings-per-share as presented in the Registration Statement, Vivint Solar would incur a significant loss and negative earnings-per-share for the three months ended September 30, 2014.  This was not disclosed to potential investors in the Registration Statement and, accordingly, the Registration Statement was misleading and failed to disclose information required by the Securities Act and Regulation S-K.

49.     The recurring installation delays and their material impact on the Vivint Solar's earnings did not become evident until the release of the Company's quarterly financials for the third quarter of fiscal 2014, which included a press release issued after the market closed on

17

November 10, 2014, and the Company's quarterly report on Form 10-Q filed with the SEC after the market closed on November 12, 2014.

50.     The press release indicated significantly that for the three-month period ended September 30, 2014, the Company's net income attributable to its non-controlling interests in the Investment Funds had increased by $72,273,000 from ($88.7 million) to ($16.4 million), an increase of approximately 82% in just three months.  The press release also indicated that Vivint Solar had suffered a "GAAP Net Loss Attributable to Stockholders per Diluted Share" of ($0.45) per share and a "Non-GAAP Earnings Before Non-Controlling Interests and Redeemable Non-Controlling Interests per Share" loss of ($0.66) per share, both of which were byproducts of the dramatic increase in delayed installations and operating losses.

51.     In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.

52.     The Company's quarterly report reiterated the financial information contained within the press release.  (Form 10-Q at 27.)  With respect to the difference in Vivint's net loss attributable to its non-controlling interests in the Investment Funds, Vivint Solar explained that: "Generally, gains and losses that are allocated to the fund investors under the HLBV method relate to hypothetical liquidation gains and losses resulting from differences between the net assets of the investment fund and the partners' respective tax capital accounts in the investment fund.   Specifically, the decrease in net loss attributable to non-controlling interests and redeemable non-controlling interests was primarily due to the timing of our sale and subsequent installation of solar energy systems into certain investment funds.  Losses to the fund investors were also driven by a reduction in certain fund investors' claims on net assets due to the election

of the partnership to take bonus depreciation allowances under Internal Revenue Code Section 179, as well as the receipt of ITCs that were primarily allocated to fund investors." (Form 10-Q at 29, 31.)  The Form 10-Q confirmed that the Company had been impacted materially by delayed installations and increased operating losses as a result.

      53.    In response to the Form 10-Q, Vivint Solar stock declined from $12.33 per share on November 12, 2014 to $11.70 per share on November 13, 2014, a decrease of $0.63 per share (approximately 5%), on unusually heavy volume.

      54.    Pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303), Vivint Solar was required to:

> (i)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

      55.    The untimeliness and/or delay of Vivint Solar's installations and the impact they were having (and would ultimately have) on the Company's net income qualified as either "unusual or infrequent events or transactions" or "known trends or uncertainties" pursuant to Item 303 of Regulation S-K.  Accordingly, Vivint Solar was required to describe these items in the Registration Statement.

56.     Similarly, for the same reasons, these items should have been described in the Registration Statement pursuant to the Securities Act for the purpose making the statements contained therein not untrue and/or otherwise materially misleading.

57.     Vivint Solar either negligently omitted or failed to include an appropriate description of its installation problems—*i.e.*, delayed installations—and their impact on the Company's net income in the Registration Statement.   Therefore, Defendants violated the Securities Act and Regulation S-K.

B.     **Vivint Solar's Long-Term Leases and Power Purchase Agreements**

58.     The second category of information that Vivint Solar either inadvertently or negligently omitted from the Registration Statement relates to the changing market for solar energy systems.  Specifically, Vivint Solar's Registration Statement failed to provide investors with an accurate description the market's shifting preference for outright purchasing and/or financing of solar energy systems (as opposed to long-term leases and power purchase agreements).

59.     The shifting preference for purchasing and/or financing is evident.  A number of reports and articles have been written regarding the topic.  For example, GTM Research, which Vivint Solar itself referred to for market research in its Registration Statement, released a report concerning the market for third-party ownership (*e.g.*, Vivint Solar's long-term leases and power purchase agreements) in June 2014 (the "GTM Research Report").  GTM Research provides market analysis in the form of research reports, data services, advisory services, and strategic consulting in the energy (and, specifically, solar) sector.  According to the GTM Research Report, written by Nicole Litvak, the third-party ownership model was predicted to peak in 2014

and gradually lose market share to solar financing.  The change in preferences, according to GTM Research, was (and will be) due to the wide availability of solar financing options.

60.     Further to the point, an additional report from the National Renewable Energy Laboratory ("NREL"), further confirmed the changing market landscape while also explaining the underlying motivations.  NREL serves as the United States' primary laboratory for renewable energy and energy efficiency research and development.  NREL is owned by the United States government and is funded through the U.S. Department of Energy.  The report was written by David Feldman and Travis Lowder in November 2014, titled *Banking on Solar: An Analysis of Banking Opportunities in the U.S. Distributed Photovoltaic Market* (the "Solar Market Report").

61.     The Solar Market Report focuses on the emergence of solar loan financing arrangements, which differ from the third-party ownership model employed by Vivint Solar (*i.e.*, long-term leases and power purchase agreements).  The differences are as follows: first, in a solar financing arrangement, the homeowner would retain ownership of the solar energy system. Second, because the homeowner owns the solar energy system, the homeowner becomes eligible for the tax benefits and other incentives available to solar energy system owners.  Third, a solar energy system owner stands in a far better position in terms of adding equity to his or her property (relative to a lessee or power purchase agreement holder) due to the fact that the owner would be able to retain the system indefinitely.  Finally, the cost of the financing itself stands to be cheaper than a third-party ownership arrangement as the cost of capital in the third-party ownership arrangements begins to increase as the available tax incentives decrease.  (Solar Market Report at 11-12.)

62.     According to the Solar Market Report, solar loan financing has become more and more popular in recent times.  The increase in market share has, in part, been due an increase in

available lending options, increased stability with regard to lending to individuals, and the year-over-year declines in the costs associated with installing a solar energy system.  (Solar Market Report at 17.)  Between October 2013 and October 2014, at least nine new solar loan programs were announced by Admirals Bank, Digital Credit Union, Dividend Solar, Lightstream, Mosaic, OneRoof Energy, SolarCity, Sungage Financial, and WJ Bradley.  (Solar Market Report at 11.)

63.     In addition to analysts and governmental agencies identifying the trend away from third-party ownership, a number of Vivint Solar's former employees confirmed that the Company had been confronting the issue for some time.  For example:

- Former Employee 5 reported that Vivint Solar had been losing a considerable amount of customers due to the Company's refusal to offer purchasing alternatives.  FE 5 was a Vivint Solar Operations Manager in the San Francisco Bay Area (Concord, California) from July 2012 through December 2014.  He reported to Douglas Hatch, West Coast Regional Manager of Operations, and was responsible for managing installations throughout sales process.  FE 5 estimated that that he oversaw approximately 1,500 installations in 2014, and that he lost approximately 15% to 20% of potential customers due to the fact that Vivint Solar was unable to offer a direct purchasing option for the solar energy systems.  These customers were most concerned with the impossibility of ever owning the solar energy system, in spite of the fact that it would be installed on the homeowner's house for upwards of 20 years.

- Former Employee 6 worked as a Vivint Solar Sales Manager from January 2013 until November 2014.  FE 6 reported to Jared Slemboski, District Sales Manager for Northern California, and was responsible for training sales team and tracking sales objectives.  FE 6 corroborated FE 5 in that he too was able to state that Vivint Solar lost potential customers due to the fact that the Company did not offer a purchasing option.  FE 6 estimated that approximately 5% to 10% of his potential customers (approximately 200 installations) declined to sign with Vivint Solar because the Company did not offer a purchasing or financing option.

64.     Even Vivint Solar's largest competitor, SolarCity, was aware of the shift in the marketplace.  In October 2014, SolarCity revealed its "MyPower" financing program which was designed to assist its customers purchase its solar energy systems.  Lyndon Rive, SolarCity's

Chief Executive Officer, anticipated that half of SolarCity's revenue would be derived from solar financing by mid-2015. As of January 2015, more than 8,000 customers have taken advantage of the "MyPower" financing program.

65.    The shifting preferences among Vivint Solar's potential customers did not become evident until the Company released its quarterly financials for the third quarter of fiscal 2014 in a press release issued after the market closed on November 10, 2014.

66.    The press release indicated significantly that although the Company's "Operating Leases and Incentives Revenue" for the third quarter ended September 30, 2014, was $7.1 million, Vivint Solar was forecasting significantly less for the fourth quarter of fiscal 2014. Specifically, the press release indicated that the Company estimated fourth-quarter "Total Revenue" (as opposed to only "Operating Leases and Incentives Revenue") to equal between $5.5 million and $6.5 million. Compared to the Company's "Total Revenue" for the quarter ended September 30, 2014, which was $8.3 million, the Company's forecasted revenue for the remaining quarter of the year was expected to decline by approximately 20% to 30%.

67.    Additionally, although the press release indicated that the Company installed 49 megawatts of solar energy systems (a key metric used by the Company to track the capacity of its solar energy systems) for the third quarter ended September 30, 2014, the Company was forecasting lower installations for the fourth quarter of fiscal 2014. Specifically, the press release indicated that the Company was projecting 45 to 47 megawatts of installation.

68.    Collectively, the Company's third-quarter earnings and fourth-quarter guidance signaled to investors that growth would be slowing. This slowdown in growth was, in turn, interpreted as evidence of the market's shift away from long-term leases and power purchase agreements in favor of solar financing (which Vivint Solar did not offer).

69.     In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.

70.     Pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303), Vivint Solar was required to:

> (i)     Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

71.     The evident, material shift in market preference away from long-term leases and power purchase agreements in favor of purchasing and financing qualified as either "unusual or infrequent events or transactions" or "known trends or uncertainties" pursuant to Item 303 of Regulation S-K.   Accordingly, Vivint Solar was required to describe these items in the Registration Statement.

72.     Vivint Solar either negligently omitted or failed to include an appropriate description of the then-current and likely future marketplace preferences for solar financing and purchasing (as opposed to Vivint Solar's long-term leases and power purchase agreements). Therefore, Defendants violated Regulation S-K.

24

C.    **Market Saturation Impacting Vivint Solar's Operations in Hawaii**

73.    The third category of information that Vivint Solar either inadvertently or negligently omitted from the Registration Statement relates to the market for solar energy systems within Hawaii as it existed at the time of the IPO.  As of June 30, 2014, 15% of the Company's operations were confined to Hawaii.  (Registration Statement at 28.)  Accordingly, the market for Vivint Solar's solar energy systems in Hawaii was of particular importance to investors.  Unbeknownst to investors at the time of the Registration Statement, the demand for solar energy systems in Hawaii was severely depressed due to market saturation and burdensome regulations.

74.    Oahu is home to two-thirds of Hawaiian residents.  Oahu also represents Hawaii's largest solar energy system market and, at the time of the IPO, was heavily saturated.  In September 2013, Hawaiian electric utilities informed all solar energy contractors that that the electrical circuits in the area had become oversaturated with residential rooftop solar energy systems.  This was an issue of concern because the oversaturation was posing system and safety threats.[4]  In an article titled, *Hawaii solar boom so successful, it's been halted*, a utility spokesperson was quoted explaining that, "We can't allow circuits to become dangerous . . . . We can't allow circuits to become unreliable because there's too much PV on those circuits."[5]  Following the electric utilities' notice to solar energy contractors, the market for residential solar energy systems slowed dramatically.[6]

75.    Shortly thereafter, Hawaii began instituting regulations aimed at slowing and/or decreasing solar energy generation.  In April 2014, the Hawaii Public Utility Commission (the

---

[4] David Thompson, *Hawaii's Solar Energy Revolution*, HONOLULU MAGAZINE, February 19, 2014.
[5] Anne C. Mulkern, *Hawaii solar boom so successful, it's been halted*, CLIMATEWIRE, December 20, 2013.
[6] *Id.*

"PUC") issued an order concerning reliability standards for Hawaii's electric utilities.  In that

order, the PUC explained the necessity for new regulations concerning rooftop solar generation:

> The commission believes it is unrealistic to expect that the high growth in distributed solar PV capacity additions experienced in the 2010 - 2013 time can be sustained, in the same technical, economic and policy manner in which it occurred, particularly when electric energy usage is declining, distribution circuit penetration levels are increasing, system-level challenges are emerging and grid fixed costs are increasingly being shifted to non-solar PV customers.

> The commission submits that the distributed solar PV industry in Hawaii will, out of necessity due to their accomplishments thus far, have to migrate to a new business model not unlike what is expected for [electric utility] companies as a result of disruptive technologies. The distributed solar business model will need to shift from a customer value proposition predicated upon customers avoiding the grid financially - but relying upon it physically and thereby creating circuit and technical challenges -to a new model where the customer value-proposition is predicated upon how distributed solar PV benefits both individual customers and the overall electric system, and hopefully becomes a key contributor to Hawaii's grid modernization, and most importantly as a consequence, customers are compensated by the electric utility for the grid value created.[7]

76.     The PUC's order resulted in a demand for new regulation aimed at

accommodating the dramatic increase in Hawaiian solar energy.   Among the regulations

proposed in response was a reform concerning net metering rules.  (Traditionally, net metering

has been a system whereby a homeowner producing solar energy is permitted to sell solar

electric to the utility company in exchange for an offset on his or her utility bill.)  The reform

required all electric utility customers to pay a fee of $50-$71 per month plus a kWh charge for

electricity consumed from the electric utility.  In addition, any customer selling electricity back

to the electric utility under net metering would be charged an additional $16 fee each month for

the privilege.  Further, the rate at which the electric utility purchases the customer-generated

solar power would change from the retail rate to the utility's "avoided cost" or wholesale cost,

---

[7] *In the Matter of Public Utilities Commission*, Docket No. 2011-0206, Order No. 32053 (April 28, 2014), ¶¶ 34-35.

which was much less than the retail rate and would accordingly yield substantially less benefits to the customer.[8]

77.     On August 26, 2014, approximately one month before the Registration Statement went effective, Hawaiian utilities filed plans with the PUC codifying the regulatory regime outlined above.  These plans stipulated three major changes to Hawaiian solar energy:

- A fixed monthly charge applied to all customers, allocating fixed customer service and demand costs in a fair, equitable and revenue-neutral manner within customer classes;

- An additional fixed monthly charge applied only to new DG customers to account for additional standby generation and capacity requirements provided by the electric utility; and

- A "Gross Export Purchase model" for export DG. Under this model, coincident self-generation from DG-PV and usage is not metered and customers sell excess electricity near wholesale rates and buy additional electricity at variable retail rates.[9]

78.     The net effect of the oversaturation and increased regulation has also led to a dramatic decline in employment within the Hawaiian solar energy sector.  During 2014, approximately 3,000 solar energy employees lost their jobs.[10]  Further, the number of permits issued for new rooftop solar energy systems dropped to less than 50% of the permits issued in the previous year.[11]

79.     Contrary to the above factual account of the Hawaiian market for solar energy, Vivint Solar's Registration Statement described it as "significantly underpenetrated." (Registration Statement at 83.)  This was untrue and/or inaccurate because, as of the time of the

---

[8] Stephen Lacey, *As Hawaii Prepares for Utility Reform, the State's Solar Industry Sheds 3,000 Workers*, GREENTECH MEDIA (Sept. 25, 2014).
[9] Joseph P. Viola, Response to Hawaii Public Utilities Commission Order No. 32053, August 26, 2014.
[10] Stephen Lacey, *As Hawaii Prepares for Utility Reform, the State's Solar Industry Sheds 3,000 Workers*, GREENTECH MEDIA (Sept. 25, 2014).
[11] *Id.*

Registration Statement, the solar energy market in Hawaii was significantly saturated and burdened with increased regulation.

80.     Along the same line, immediately after advising investors that 53% and 15% of the Company's total installations had been in California and Hawaii, Vivint Solar noted that it "expect[ed] much of [its] near-term future growth to occur in California . . . ."  (Registration Statement at 28.)  Absent from this disclosure is an appropriate description of the then-current state of Hawaii's solar energy market.  By omitting this information, the Registration Statement reinforced the untrue and/or inaccurate statement above concerning Hawaii's "significant[] underpenetrat[ion]."

81.     The true state of the Hawaiian solar energy market did not become evident until the Company released its quarterly financials for the third quarter of fiscal 2014 in a press release issued after the market closed on November 10, 2014 and the Company's quarterly report on Form 10-Q after the market closed on November 12, 2014.

82.     The press release indicated significantly that although the Company's "Operating Leases and Incentives Revenue" for the third quarter ended September 30, 2014, was $7.1 million, Vivint Solar was forecasting significantly less for the fourth quarter of fiscal 2014. Specifically, the press release indicated that the Company estimated fourth-quarter "Total Revenue" (as opposed to only "Operating Leases and Incentives Revenue") to equal between $5.5 million and $6.5 million.  Compared to the Company's "Total Revenue" for the quarter ended September 30, 2014, which was $8.3 million, the Company's forecasted revenue for the remaining quarter of the year was expected to decline by approximately 20% to 30%.

83.     Additionally, although the press release indicated that the Company installed 49 megawatts of solar energy systems (a key metric used by the Company to track the capacity of

its solar energy systems) for the third quarter ended September 30, 2014, the Company was forecasting lower installations for the fourth quarter of fiscal 2014. Specifically, the press release indicated that the Company was projecting 45 to 47 megawatts of installation.

84.     Collectively, the Company's third-quarter earnings and fourth-quarter guidance signaled to investors that growth would be slowing. This slowdown in growth was, in turn, interpreted as evidence of Hawaii's adverse market conditions due to oversaturation and increased regulation.

85.     In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.

86.     Further evidence of Hawaii's adverse market conditions was contained within the Company's Form 10-Q, which indicated that the Company's operations in Hawaii had declined to 12% from 15%. (Form 10-Q at 39.)

87.     In response to the Form 10-Q, Vivint Solar stock declined from $12.33 per share on November 12, 2014 to $11.70 per share on November 13, 2014, a decrease of $0.63 per share (approximately 5%), on unusually heavy volume.

88.     Considering that as of June 30, 2014, 15% of the Company's operations were confined to Hawaii, the Registration Statement's statements concerning Hawaii as well as the then-current state of the Hawaiian solar energy market were of significant importance to investors. The Registration Statement should have contained a materially accurate description of the Hawaiian solar energy market as it existed at the time of the IPO. Vivint Solar either negligently omitted or failed to include an appropriate description of the then-current and likely

future market for solar energy within Hawaii.  Accordingly, Defendants violated the Securities Act.

89.     Separate and apart from Defendants' violation of the Securities Act, Defendants also violated Regulation S-K.  Pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303), Vivint Solar was required to:

> (i)     Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii)     Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

90.     The economic changes within Hawaii, a geographical area comprising 15% of Vivint Solar's operations at the time of the IPO, were having a material impact on the Company's operations within that state.  Further, given the nature of the economic changes, it was reasonably likely that they would continue to material impact the Company's operations going forward.  Hawaii's solar energy market, and the events taking place therein at the time of the IPO, qualified as either "unusual or infrequent events or transactions" or "known trends or uncertainties" pursuant to Item 303 of Regulation S-K.  Accordingly, Vivint Solar was required to describe these items in the Registration Statement.

91.     Vivint Solar either negligently omitted or failed to include an appropriate description of the then-current and likely future market for solar energy within Hawaii. Accordingly, Defendants violated Regulation S-K.

## CLASS ACTION ALLEGATIONS

92.     Plaintiff bring this action on behalf of all individuals and entities who purchased or otherwise acquired Vivint Solar securities in connection with and/or traceable to the Company's IPO and were damaged, excluding the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

93.     The members of the Class are so numerous that joinder of all members is impracticable.  Vivint Solar securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vivint Solar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon completion of the IPO, Vivint Solar had 105,303,122 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.  Joinder would be highly impracticable.

94.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

95.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

96.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

> (a)     whether the Securities Act was violated by Defendants' respective acts as alleged herein;
>
> (b)     whether the Defendants acted negligently; and
>
> (c)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

### The Defendants Violated Section 11 of the Securities Act

98.     Plaintiff repeats and realleges the allegations contained above.

99.     As set forth above, Vivint Solar's Registration Statement contained untrue and/or incorrect statements of material fact and omitted material facts required to be stated in order to make the statements contained therein accurate.

100.     Vivint Solar is the registrant for the IPO.   As issuer of the shares, Vivint Solar is strictly liable to Plaintiff and to the members of the Class for the materially untrue statements and omissions alleged herein.

101.    Vivint Solar's Registration Statement was signed by Defendant Butterfield on behalf of the Company.

102.    The Individual Defendants each appointed Defendants Butterfield and Russell as their true and lawful attorneys-in-fact and agents for the purpose of "sign[ing] any and all amendments (including post-effective amendments) to [the Registration Statement] and any and all additional registration statements and amendments thereto filed pursuant to Rule 462(b) of the Securities Act of 1933 . . . ."  The Individual Defendants signed or authorized others to sign the Registration Statement on their behalf.

103.    The Individual Defendants were directors of or partners in Vivint Solar at the time of the filing of the Registration Statement.

104.    The Individual Defendants were named in the Registration Statement as being or about to become a director of, or person performing similar functions in, the Vivint Solar.

105.    The Underwriter Defendants were underwriters with respect to the Vivint Solar securities offered in the IPO.

106.    Plaintiff and the other members of the Class purchased Vivint Solar securities in the IPO.

107.    Plaintiff and the other members of the Class were damaged by Vivint Solar, the Individual Defendants, and the Underwriter Defendants as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

108.    This claim was brought within the applicable statute of limitations.

109.    By reason of the foregoing, Vivint Solar, the Individual Defendants, and the Underwriter Defendants have violated Section 11 of the Securities Act and are liable to Plaintiff and the other members of the Class

## COUNT II

### The Underwriter Defendants Violated Section 12(a)(2) of the Securities Act

110.    Plaintiff repeats and realleges the allegations contained above.

111.    The Underwriter Defendants reserved up to 5% of the shares offered in the IPO "for sale to business associates, friends and family of our officers, directors and Vivint service providers." (Registration Statement at 12.)

112.    The Underwriter Defendants offered or sold Vivint Solar securities by the use of means or instruments of transportation or communication in interstate commerce or the mails.

113.    The Underwriter Defendants offered or sold Vivint Solar securities by means of a prospectus or oral communication.

114.    The prospectus or oral communication by which the Underwriter Defendants offered or sold Vivint Solar securities contained an untrue statement of a material fact and omitted to state a material fact necessary in order to make the statements not misleading.

115.    The Underwriter Defendants knew, or could have known through the exercise of reasonable care, of the untrue statements and omissions in the Registration Statement.

116.    Members of the Class, whom Plaintiff represents herein, purchased Vivint Solar securities directly from the Underwriter Defendants.

117.    As set forth above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements accurate.

118.    Members of the Class, whom Plaintiff represents herein, did not know that the Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements accurate.

119.     Those members of the Class who purchased Vivint Solar securities in the IPO from the Underwriter Defendants have sustained damages as a result of the untrue statements of material facts and omissions in the Registration Statement, for which they hereby elect to rescind and tender their shares of Vivint Solar common stock in return for the consideration paid for Vivint Solar common stock with interest.

120.     This claim was brought within the applicable statute of limitations.

121.     By virtue of the foregoing, the Underwriter Defendants have violated Section 12(a)(2) of the Securities Act.

**COUNT III**

**The Individual Defendants Violated Section 15 of the Securities Act**

122.     Plaintiff repeats and realleges the allegations contained above.

123.     Each of the Individual Defendants participated in the operation and management of Vivint Solar at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Vivint Solar's business affairs.

124.     Each of the Individual Defendants was involved in the day-to-day operations of the Company at the highest levels.

125.     Each of the Individual Defendants was privy to confidential proprietary information concerning the Company and its business and operations.

126.     The Individual Defendants were senior officers and directors of Vivint Solar.  Due to their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

127.    The Individual Defendants each signed, or caused to be signed on their behalf, the Registration Statement.

128.    The Individual Defendants were controlling persons of Vivint Solar under the Securities Act.

129.    Vivint Solar's conduct, as alleged herein, constitutes a violation of Sections 11 and 12(a)(2) of the Securities Act.  The Individual Defendants are liable to Plaintiffs and the other members of the Class, jointly and severally with and to the same extent as Vivint Solar, for violations under Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, or rescission;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a jury trial.

Dated:  February 13, 2015                    LEVI & KORSINSKY LLP


                                             <u>/s/ Nicholas Porritt</u>
                                             Nicholas I. Porritt
                                             Adam M. Apton
                                             30 Broad Street, 24th Floor
                                             New York, NY 10004
                                             Tel: (212) 363-7500
                                             Fax: (866) 367-6510

                                             *Attorneys for Lead Plaintiff*
                                             *Robby Shawn Stadnick and Lead*
                                             *Counsel for Class*

4845-5318-5569, v. 2

37