UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRENNEN HYATT, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 1:14-cv-09283-KBF |
| VIVINT SOLAR, INC., THE BLACKSTONE GROUP L.P., GREGORY S. BUTTERFIELD, DANA C. RUSSELL, DAVID F. D'ALESSANDRO, ALEX J. DUNN, BRUCE McEVOY, TODD R. PEDERSEN, JOSEPH F. TRUSTEY, PETER F. WALLACE, JOSEPH S. TIBBETTS, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., and BLACKSTONE ADVISORY PARTNERS L.P., | **SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | |
| THOMAS LIMA, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff(s), | |
| v. | Case No. 1:14-cv-09709-KBF |
| VIVINT SOLAR, INC., THE BLACKSTONE GROUP L.P., GREGORY S. BUTTERFIELD, DANA C. RUSSELL, DAVID F. D'ALESSANDRO, ALEX J. DUNN, BRUCE McEVOY, TODD R. PEDERSEN, JOSEPH F. TRUSTEY, PETER F. WALLACE, JOSEPH S. TIBBETTS, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE | |

SECURITIES (USA) LLC, CITIGROUP
GLOBAL MARKETS INC., DEUTSCHE
BANK SECURITIES INC., MORGAN
STANLEY & CO. LLC, BARCLAYS
CAPITAL INC., and BLACKSTONE
ADVISORY PARTNERS L.P.,

Defendants.

## TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 5

PARTIES ................................................................................................................................. 5

SUBSTANTIVE ALLEGATIONS ......................................................................................... 8

    A.    The Registration Statement Omitted that Vivint Solar's Net Income Declined $40 Million and Earnings-Per-Share Dropped $0.52 in the Weeks Preceding the Initial Public Offering.................................................................................................................. 10

    B.    Vivint Solar's Market Was Decreasing Due to Increasing Consumer Preference for First-Party Ownership.............................................................................................. 26

    C.    Market Conditions In Hawaii Were Adverse to Vivint Solar's Operations.................. 30

CLASS ACTION ALLEGATIONS ......................................................................................... 39

COUNT I ................................................................................................................................. 41

COUNT II ................................................................................................................................ 42

COUNT III ............................................................................................................................... 44

PRAYER FOR RELIEF .......................................................................................................... 45

JURY TRIAL DEMANDED.................................................................................................... 46

Lead Plaintiff Robby Shawn Stadnick ("Plaintiff") alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Vivint Solar, Inc. ("Vivint Solar" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This case arises from the sale by the Company and other Defendants on October 1, 2014, of 20,600,000 shares of Vivint Solar common stock to members of the public pursuant to a misleading Registration Statement and Prospectus.  As a result of the stock offering, Vivint Solar received over $300 million in proceeds.  Shortly, after the initial public offering of its stock, Vivint Solar disclosed its financial results for the quarter-ended September 30, 2014, the quarter that closed *before* the IPO took place.  These financial results were far worse than what was disclosed in the Prospectus and Registration Statement and missed analyst expectations by 143%.  As a result, Vivint Solar's stock price dropped by over 22%, or $3.32 per share.  Vivint Solar's public stockholders collectively lost over $60 million.

2.      Vivint Solar provides solar energy to residential homeowners.  It does not, however, simply sell solar energy systems to its customers.  Instead, using a direct sales model, Vivint Solar's sales force solicits customers on a door-to-door basis, offering solar panel energy systems for little-to-no money upfront through long-term leases or power purchase agreements. Homeowners who accept the offer enter into these agreements—which last 20 years—and

typically benefit from the electricity produced from the solar energy systems once installed and operational.

3.      The Company benefits as well.  Due to the fact that these long-term arrangements allow Vivint Solar to retain *ownership* of the solar energy systems, the Company is able to receive a number of local, state, and federal benefits associated with solar energy investments, including but not limited to investment tax credits and accelerated tax depreciation.  These benefits (referred to as tax equity investments) along with the homeowners' monthly payments (referred to as customer receivables) are then bundled together and securitized.  This is how Vivint Solar makes its money—through the securitization of its tax equity and customer receivables.

4.      In advance of the Company's October 1, 2014 initial public offering (the "IPO"), Vivint Solar provided investors with an overview of its business model in its Registration Statement and Prospectus ("Registration Statement" refers collectively to the Company's Registration Statement on Form S-1 filed with the SEC on August 26, 2014, Amendment No. 1 to the Registration Statement on Form S-1/A filed with the SEC on September 19, 2014, Amendment No. 2 to the Registration Statement on Form S-1/A filed with the SEC on September 26, 2014, and the Prospectus on Form 424B4 filed with the SEC on October 1, 2014.  Vivint Solar's Registration Statement was declared effective on September 30, 2014 at 4:00 p.m.  Citations to "Registration Statement at __" refers to pages within the Prospectus on Form 424B4.).  The Registration Statement presented Vivint Solar as a source of highly predictable and stable cash flows based on a 20-year stream of payments from creditworthy customers under long-term contracts.  Vivint Solar presented financial statements for 2013 and the first six months of 2014 which showed consistently positive net income and earnings-per-share for its common stock, the security being sold in the IPO.  Vivint Solar also presented itself as an extremely well-financed operation based

on the funding commitments it had received through its various investment funds.  With this money, Vivint Solar represented that it would be able to build upon his history of positive and growing earnings-per-share as well as continue penetrating underserved markets throughout the country.  This presentation was highly misleading.

5.      In fact, Vivint Solar presents a highly risky and volatile income stream with the only certainty being substantial operating losses into the foreseeable future.  Vivint Solar has a highly complex capital structure, involving many investment funds treated as variable interest entities for accounting purposes.  The financial operations of these investment funds—as opposed to the Company itself—dictates the Company's net income and earnings-per-share.  Factors such as the timing and amount of third-party investments into the investment funds dramatically impact the Company's net income and loss.  It was primarily the operations of its Investment Funds that caused Vivint Solar to dramatically swing from net income of $0.07 for the three months ended June 30, 2014 (as reported in the Registration Statement) to a net loss of $0.66 for the three months ended September 30, 2014 (which was not disclosed in the Registration Statement filed October 1, 2014).  Vivint Solar did not disclose the impact of the operations of these investment funds on the Company's third-quarter earnings in the Registration Statement, even though the third-quarter closed the day before the Company's initial public offering.

6.      Vivint Solar's Registration Statement also failed to disclose that it was facing additional difficulties leasing its solar energy systems as customers began to increasingly look to purchase the system themselves so as to be able to claim the related federal and state tax incentives.  This increased the cost and expense of identifying and signing new customers.  Vivint Solar offered no option for customers to buy their own solar energy system.

7.     Finally, contrary to the Registration Statement's repeated statements that the Company's operations were expanding in underpenetrated markets, Vivint Solar was confronting heightened regulation and market saturation.  This was especially the case in Hawaii, a geographic territory which accounted for 15% of the Company's installations at the time of the initial public offering (October 1, 2014), but has since dropped to 10% as of December 31, 2014.

8.     On November 10, 2014, it became evident that the Registration Statement's description of the Company's operations and finances were materially misleading and/or inaccurate.  After the market closed, Vivint Solar issued a press release announcing its earnings for the third quarter of fiscal 2014.  The press release indicated that Vivint Solar had suffered a "Non-GAAP Earnings Before Non-Controlling Interests and Redeemable Non-Controlling Interests per Share" loss of ($0.66) per share.  Analysts, meanwhile, had been projecting a loss of only ($0.27) per share.  In other words, *Vivint Solar missed analyst projections by 143%.*  The press release also indicated that the Company would be lowering its guidance for the fourth quarter, signaling to the market that growth would be slowing.

9.     In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.  Following the release of the Company's quarterly report on Form 10-Q, Vivint Solar stock declined even further from $12.33 per share on November 12, 2014 to $11.70 per share on November 13, 2014, a decrease of $0.63 per share (approximately 5%).

10.    Plaintiff brings this suit to recover for the damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 11, 12(a), and 15 of the Securities Act (15 U.S.C. §§ 77k(a), 77l(a), and 77o(a)).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

13.     Venue is proper in this District pursuant to Section 22 of the Securities Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged in this Complaint occurred in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff purchased Vivint Solar common stock pursuant and/or traceable to the IPO, as set forth in the certification submitted in support of Plaintiff's motion for lead plaintiff and incorporated by reference herein, and was damaged thereby.

16.     Defendant Vivint Solar is a residential solar energy unit installer that leases solar energy systems to residential homeowners. Vivint Solar operates in Arizona, California, Hawaii, Maryland, Massachusetts, New Jersey, and New York. As of June 30, 2014, approximately 53% and 15% of total installations were in California and Hawaii, respectively. Of the Company's 37 offices, 21 were located in these states. (Registration Statement at 28, 135.) Following the IPO, Vivint Solar stock traded on the New York Stock Exchange under the ticker symbol "VSLR".

17.     Defendant The Blackstone Group L.P. ("Blackstone"), based in New York City, is an investment firm and the world's largest alternative asset manager. Blackstone's alternative

asset management business includes the management of corporate private equity funds, real estate funds, hedge fund solutions, credit oriented funds and closed-end mutual funds. Blackstone also provides various financial advisory services, including financial and strategic advisory, restructuring and reorganization advisory and fund placement services. Through its different investment businesses, as of June 30, 2014, Blackstone had assets under management of approximately $279 billion.

18.     By virtue of its ownership of Vivint Solar common stock, Defendant Blackstone controls Vivint Solar. Through its affiliate 313 Acquisition LLC, Blackstone owned or controlled 97% of Vivint Solar's common stock pre-IPO and 78% of Vivint Solar's common stock after the IPO. Through 313 Acquisition LLC, Blackstone nominated two directors to Vivint Solar's Board of Directors and another director is a current Blackstone managing director. Pursuant to a Support and Services Agreement, Blackstone Management Partners LLC, an affiliate of Blackstone provides support services and due diligence services. In addition, two affiliates of Blackstone are investors in three investment funds organized by Vivint Solar. In the Registration Statement, Vivint Solar warns investors that Blackstone and its affiliates control it and Blackstone's interests may conflict with Vivint Solar and its stockholders.

19.     Defendant Gregory S. Butterfield ("Butterfield") is, and was at the time of the IPO, Chief Executive Officer ("CEO"), President and a director of Vivint.

20.     Defendant Dana C. Russell ("Russell") is, and was at the time of the IPO, Chief Financial Officer ("CFO") of Vivint.

21.     Defendants David F. D'Alessandro ("D'Alessandro"), Alex J. Dunn ("Dunn"), Bruce McEvoy ("McEvoy"), Todd R. Pedersen ("Pedersen"), Joseph F. Trustey ("Trustey"), Peter

F. Wallace ("Wallace"), and Joseph S. Tibbetts ("Tibbetts") are, and were at the time of the IPO, directors of Vivint.

22.     Defendants Butterfield, Russell, D'Alessandro, Dunn, McEvoy, Pedersen, Trustey, Wallace, and Tibbetts are referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement issued in connection with the IPO.

23.     Defendants Goldman, Sachs & Co. ("Goldman"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), and Blackstone Advisory Partners L.P. ("Blackstone Advisory Partners") (collectively, the "Underwriter Defendants") are financial services companies that acted as underwriters and joint managers of Vivint's IPO, helping to draft and disseminate the offering documents.  Each of the Underwriter Defendants maintains either their principal place of business or executive offices in this District.

24.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia,* in underwriting public offerings of securities.  They served as the underwriters of the IPO and shared more than $20 million in fees collectively.  The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Vivint stock in the IPO.  The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Vivint, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Vivint that it would indemnify and hold them harmless from any liability under the federal securities laws.  They also made certain that Vivint had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Vivint and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Vivint, an undertaking known as a "due diligence" investigation.   The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Vivint's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Vivint's lawyers, management and top executives and engaged in "drafting sessions" between at least May 2014 and October 2014.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Vivint stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Vivint would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Vivint management and top executives, the Underwriter Defendants knew, or should have known, of Vivint's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

25.     Vivint Solar provides solar energy to residential homeowners.  For "little to no money upfront," Vivint Solar will install a solar energy system on a customer's roof that is assured to provide the customer with savings of 15% to 30% relative to utility-generated electricity. (Registration Statement at 124.)

26.     In exchange, Vivint Solar's customers agree to enter into long-term leases or power purchase agreements.  Both the long-term leases and power purchase agreements (often referred to as PPAs) have 20-year terms.  While differences exist between the leases and the power purchase agreements (relating to how the customer receives the solar energy and from whom), both are intended to accomplish several specific objectives for the Company.  First, the leases and

8

power purchase agreements require Vivint Solar's customers to make monthly payments throughout the 20-year term, which are intended to provide the Company with a secure stream of revenue.  Second, by retaining ownership of the solar energy systems, Vivint Solar is able to qualify for and benefit from investment tax credits (also referred to as ITCs), accelerated tax depreciation, and other incentives from federal, state, and local governments.  (Registration Statement at 124.)

27.     Vivint Solar's business strategy is almost entirely devoted to monetizing the benefits it receives through the long-term leases and power purchase agreements.  Vivint Solar accomplishes this through complex securitization mechanisms involving a number of related investment funds.  As of September 17, 2014, Vivint Solar had raised 10 investment funds through which any number of financial investors had committed to invest significant amounts of capital (the "Investment Funds").  Vivint Solar relies on this capital to fund its business operations, including the purchase, installation, and maintenance of its solar energy systems.  (Registration Statement at 124-25.)

28.     Vivint Solar's access to capital through the Investment Funds was critical, given its "little to no money upfront" business plan.  Indeed, Vivint Solar's very first risk factor within the Registration Statement's "RISK FACTOR" section stressed the importance of Vivint Solar's continued access to capital: "If we are unable to establish new investment funds when needed, or upon desirable terms, to enable our customers' access to our solar energy systems with little to no upfront cost to them, we may be unable to finance installation of our customers' systems or our cost of capital could increase, either of which would have a material adverse effect on our business, financial condition, results of operations and prospects."  (Registration Statement at 19.)  Because Vivint Solar offered only long-term leases and power purchase agreements (as opposed to outright

purchases and/or financing options), Vivint Solar was resigned to collecting its solar energy system revenue on a monthly basis over the course of 20 years.  Consequently, the Company required capital to fund its operations while its long-term payment stream matured.

29.     Notwithstanding the Investment Funds, Vivint Solar sought additional capital from the public equity markets.  Beginning in May 2014, Vivint Solar submitted a draft registration statement to the SEC, which the Company then revised a number of times in response to SEC correspondence.  On September 30, 2014, the SEC declared the Registration Statement effective, and on October 1, 2014, the Company held its IPO.  Vivint Solar sold 20,600,000 shares of its common stock at $16.00 per share, resulting in net proceeds of $300.8 million after deducting underwriting discounts and commissions and $8.6 million in offering expenses.

30.     Unbeknownst to the investing public, the Registration Statement contained materially incorrect statements and/or neglected to include material information concerning the Company's operations.  This information, which is discussed in detail below, should have been included in the Registration Statement.

**A.     The Registration Statement Omitted that Vivint Solar's Net Income Declined $40 Million and Earnings-Per-Share Dropped $0.52 in the Weeks Preceding the Initial Public Offering**

31.     Vivint Solar's Registration Statement did not accurately convey the material financial state of the Company as it existed at the time of the initial public offering.  Instead of explaining how the Company's Investment Funds had virtually obliterated Vivint Solar's earnings-per-share track-record during the course of the third fiscal quarter (*which had closed the day before the initial public offering*), Vivint Solar portrayed itself as a stable company and a good investment.  Had Vivint Solar's offering materials disclosed that the Company's earnings-per-share had undergone a massive negative swing, then investors would not have been misled by the

10

information contained within Vivint Solar's Registration Statement and the Company's stock would not have undergone a 22% decline totaling a market capitalization loss of over $260 million.

32.     The Registration Statement contained numerous statements providing investors with an inaccurate impression of the Company's then-current finances.  First, Vivint Solar's financial statements, as presented, showed a trend of stable and growing income and earnings-per-share.  The financial statements in the Registration Statement showed positive net income available to common stockholders for the quarters ended September 30, 2013, December 31, 2013, March 31, 2014, and June 30, 2014.  (Registration Statement at 99.)  Net income grew from $3,217,000 for the quarter ended December 31, 2013 to $5,493,000 for the quarter ended June 30, 2014. (Registration Statement at 99.)  Vivint Solar also reported earnings-per-share of $0.09 for the year ended December 31, 2013 and $0.16 for the six months ended June 30, 2014.  (Registration Statement at 16.)

33.     Vivint Solar supported its positive financials with an even stronger qualitative description of its operations.  Vivint Solar described its business as offering a "[l]ong-term, highly visible, recurring cash flow" from its solar energy systems.  Vivint Solar's "customers typically sign 20-year contracts for solar electricity generated by the system owned by us and pay us directly over the term of their contracts.  These customer contracts generate recurring customer payments." (Registration Statement at 125.)  Vivint Solar noted that the average FICO score of its customers was 750, an indication of excellent credit.  (Registration Statement at 133.)  Between the Company's earnings history and description of its business, the Registration Statement absolutely failed to disclose to investors that Vivint Solar's earnings-per-share for the third-quarter had *already* fallen dramatically out of line from prior periods.

11

34.     The Company's massive decline in earnings was due to the Company's operation of its Investment Funds, which, given the Registration Statement's description of its financing operations, was completely contrary to the impression presented in the Registration Statement.  In the Registration Statement, Vivint Solar repeatedly emphasized its success in marketing and attracting new investors for its Investment Funds.  On no less than *seven* occasions, Vivint Solar touted the number of Investment Funds it had raised along with the total amount of committed investments.  (Registration Statement at 3, 6, 19, 71-72, 102, 125, 131.)  The Registration Statement even provided this information as of September 17, 2014, as compared with the rest of its financial information which was current only as of June 30, 2014.  Investors reading this information in the Registration Statement were allowed to believe that the strength of the Company's Investment Funds would only bolster the Company in terms of net income and earnings-per-share available to common stockholders.

35.     Contrary to the Company's extremely positive representations concerning its Investment Funds, the operation of the Investment Funds had resulted in an approximate 742% negative decline in the Company's earnings-per-share during the course of the third-quarter (*i.e.*, $0.07 during the second-quarter to ($0.45) during the third-quarter).  The Company's earnings-per-share were impacted in this manner because Vivint Solar calculated its net income or loss available to common stockholders by subtracting the loss attributable to non-controlling interests and redeemable non-controlling interests in the investment fund, or NCIs, from Vivint Solar's overall net income or loss.  (Registration Statement at 88.)

36.     Vivint Solar's NCI losses consisted of the Investment Funds' losses that were allocable to the various fund investors (as opposed to the Company itself).  Vivint Solar calculated the losses attributable to NCIs pursuant to "a balance sheet approach using the HLBV

[Hypothetical Liquidation at Book Value] method.  Under the HLBV method, the amounts of income and loss attributed to the [NCIs] in the consolidated statements of operations reflect[ed] changes in the amounts the fund investors would hypothetically receive at each balance sheet date under the liquidation provisions of the contractual agreements of these funds . . . .  The fund investors' interest in the results of operations of these investment funds is determined as the difference in the [NCIs'] claim under the HLBV method at the start and end of each reporting period, after taking into account any capital transactions between the fund and the fund investors." (Registration Statement at 88-89.)

37.     The Registration Statement provided no substantive insight into how the Company actually performed its HLBV calculation.  Rather, Vivint Solar provided investors with an extremely high-level overview of a limited number of factors it considered when valuing the NCIs' losses.  These factors related to the various "liquidation provisions" applying to each Investment Fund, the role of "flip points" designed to provide investors with desired rates of return, the value of solar energy systems contributed to the Investment Funds by the Company, and the timing of an investor's cash contribution relative to the timing of when a solar energy system is ultimately on a customer's property.  (Registration Statement at 88-91.)

38.     The Registration Statement's discussion of its Investment Funds and its HLBV calculation failed to include any indication that the Company's net income and earnings-per-share had already been significantly damaged by the time of the initial public offering, let alone any explanation as to why or how the Investment Funds had the volatile impact they did.  The impact of the Investment Funds on the Company's net income and earnings-per-share was not only material, but was in stark contrast to the positive statements Vivint Solar repeatedly emphasized concerning the marketing and activity of these very same Investment Funds.

39.     As of October 1, 2014—the date of the initial public offering—the Company's third-quarter had already closed.  Accordingly, by the date of the initial public offering, Vivint Solar was aware of the various factors impacting its HLBV calculation, each one a key metric monitored by Vivint including the rate of installation of solar systems, new investment in each investment fund, tax credits and other benefits attributable to the fund as well as the terms of each individual fund agreement.

40.     As evidenced by Vivint Solar's quarterly report (Form 10-Q) for the third-quarter, the Company's Investment Fund asset-to-liability ratio had increased dramatically during the course of the third-quarter:

| | As of June 30, 2014 | As of September 30, 2014 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 6,211 | $ 8,986 |
| Accounts receivable, net | 1,880 | 1,688 |
| Total current assets | 8,091 | 10,674 |
| Solar energy systems, net | 308,130 | 408,035 |
| Total Assets | $ 316,221 | $ 418,709 |
| **Liabilities** | | |
| Current Liabilities: | | |
| Distributions payable to non-controlling interests and redeemable non-controlling interests | $ 3,942 | $ 3,879 |
| Current portion of deferred revenue | 93 | 135 |
| Total current liabilities | 4,035 | 4,014 |
| Deferred revenue, net of current portion | 1,864 | 2,447 |
| Total Liabilities | $ 5,899 | $ 6,461 |

(In thousands)

(Registration Statement at F-44, Form 10-Q at 11.)

41.     Between June 30, 2014 and September 30, 2014, the Company's Investment Funds had received an additional $2.75 million in cash and cash equivalents and $100 million in solar energy systems.  This represented an approximate 32% increase in the Investment Funds' total assets.  Meanwhile, the Investment Funds' total liabilities increased by only 0.1%.  This significant

influx of assets to the Investment Funds heavily impacted the Company's HLBV calculation and, in turn, Vivint Solar's net loss and earnings-per-share.

42.     Vivint Solar paid close attention to the operations of its Investment Funds.  The Registration Statement contains information and representations concerning the Investment Funds, including statements such as that the Investment Funds "finance" Vivint Solar's solar energy system installations (Registration Statement at 2); that the Company's ability to "grow" and "finance the deployment of solar energy systems" depends on the success of the Investment Funds (Registration Statement at 3); that the Company hired a new chief financial officer, new vice president of finance, new corporate controller as well as additional finance, accounting, and tax personnel to better account for its Investment Funds (Registration Statement at 29-30, 109-110); and that the Company's strategy for monetizing its solar tax credits, incentives, and bonuses revolved around the Investment Funds (Registration Statement at 73-74).  Vivint Solar kept constant track over the Investment Funds, noting the number of funds it had raised, the amount of investment committed, the number of installations permitted by the investments, and the amount of megawatts to be deployed as a result of the tax equity commitments.  (Registration Statement at 102.)  Vivint Solar apprised investors of future investment commitments and even potential investment commitments by discussing various "non-binding letters of intent" it had received. (Registration Statement at 102.)  Accordingly, by October 1, 2014, the date of the initial public offering, Vivint Solar was aware of (or, at the very least, had access to) information pertaining to the $100 million increase in Investment Fund assets and the impact it would have on the Company's net loss and earnings-per-share.

43.     Similarly, by October 1, 2014, Vivint Solar was also aware of its ongoing solar energy system installation delays and the impact that these delays would have on the Company's

net loss and earnings-per-share.  As explained by Vivint Solar in the Registration Statement, the HLBV calculation and, in turn, the Company's NCI loss, was affected by Vivint Solar's ability to timely install the solar energy systems it sold or contributed to the Investment Funds.  Often times Vivint Solar was unable to timely install the solar energy systems purchased by the fund investors; when this occurred, the solar energy systems would have a carrying value of zero.  The Investment Fund would in turn record a receivable (representing a claim to the solar energy systems if and when they were subsequently installed).  The recognition of a receivable resulted in a decrease in the Investment Fund's equity, which appeared as a loss to the Investment Fund and its investors. However, when the solar energy systems were ultimately installed, the receivable would be eliminated, the Investment Fund's equity would be increased, and the loss would be reversed. (Registration Statement at 90.)

44.     Former employees of Vivint Solar confirm that the Company was not installing its solar energy systems on a timely basis.  Plaintiff has withheld the names of certain former employees so as to avoid the risk of retaliation against the witness.  The former employees are referred to as "Former Employee __" or "FE __".  For example:

- Former Employee 1 was employed as a Vivint Solar Sales Manager in Los Angeles, California, from January 2014 through October 2014.  FE 1 reported to Mike Schreiner and Chad Vogel, Vivint Solar District Managers.  FE 1 was responsible for overseeing sales and installations in the Los Angeles market.  FE 1 recalled that as the Company grew in size, it did not have sufficient time to train new hires.  FE 1 left Vivint Solar in part because the Company was taking too long to install the solar panels he was selling.  For example, installations in Torrence and Lomita, California, could take a few months to complete.  FE 1 recalled that customers would cancel their contracts because the permitting process with local municipalities was taking too long.   FE 1 estimated that he lost approximately 40% of FE 1's customers throughout his employ with the Company.

- Former Employee 2 was also based in Los Angeles, California.  FE 2 was a Vivint Solar Account and Project Manager from March 2014 through

October 2014.  FE 2 reported to Michael Schreiber, Vivint Solar Area Sales Manager.  FE 2 was responsible for generating sales leads and managing projects from application through installation.  FE 2 estimated that he drew proposals for approximately 200 customers, only 40 to 50 of which were installed.  FE 2 recalled that the panels were not being installed because of delays in obtaining proper permits.  Further, with regard to the panels that were installed, they were not being installed properly.  FE 2 estimated that half of the installations done in his area were done improperly during his tenure.  According to FE 2, the technicians were inexperienced—for example, the technicians would drill holes in the wrong locations.  Moreover, FE 2's office was trying to install between 10 and 15 systems per week.  Between the delays in obtaining proper permits and the installation mistakes, there was an average lag time of approximately four months before the solar panels went "live."

- Former Employee 3 was a Vivint Solar Operations Manager from October 2012 through October 2014.  FE 3 was responsible for the Inland Empire – San Bernardino County, California.  FE 3 reported to Douglas Hatch, Vivint Solar Regional Manager.  FE 3 was responsible for overseeing an installations team.  FE 3 explained that installation delays occurred in part because Vivint Solar switched mounting systems at the end of the second quarter of fiscal 2014.  According to FE 3, the new systems were problematic, which resulted in Vivint Solar having to make repairs on approximately 500 to 700 accounts.  The purpose of the repairs was to improve and/or fix the "grounding" mechanisms on the solar energy systems.

- Former Employee 4 was a Vivint Solar Electrical Apprentice/Lead Inspector from January 2014 through November 2014.  FE 4 was based in San Diego, California, and reported to Mike Espinosa, former Electrical Supervisor.  FE 4 was responsible for the electrical aspects of the installations.  FE 4 corroborated FE 3's recollections regarding the problematic mounting systems and the increased repairs.  During the third quarter of 2014, Vivint Solar switched to a different mounting system that involved a different electrical connection.  Around September 2014 and into October 2014, repairs began to increase above 3 to 4 per week, which in turn delayed new installations.

45.  According to Former Employee 5, Vivint Solar and its executive management were aware of the installation delays and had access to information pertaining to the Company's installation progress.  FE 5 worked for Vivint Solar from November 2012 through July 2014 as a Representative/Sales Manager.  From March 2013 through November 2013, FE 5 served as a

District Manager/Sales Manager based in San Jose, California.  During this time, FE 5 reported to Chance Allred, Vivint Solar Vice President of Sales, and supervised between eight and 18 other Vivint Solar employees.  Prior to March 2013 and after November 2013, FE 5 worked as a Sales Representative in the Concord area, and reported to Jared Slomboski, Vivint Solar District Manager.  From June 2011 through October 2011, FE 5 worked as a sales employee in Vivint Solar's New Jersey pilot study.

46.     FE 5 stated that in or around March 2012, Vivint Solar implemented a tracking system called "Installer," which Vivint Solar sales employees inputted all data from all sales and installations.  Access to "Installer" was granted to account coordinators, sales representatives, technicians, and executive staff (including Vivint's chief executive management).  In or around June 2013, "Installer" was replaced by a new system named "Mercury."  In addition, Vivint Solar implemented a new job management tool named "Jarvis."  "Jarvis" supplied information to "Mercury," which supplied users with account statuses.  This information included the status of a particular job, including account lifecycles, *i.e.*, how many days a solar energy system was waiting for permitting, surveying, installation, etc.

47.     FE 5 recalled that the Company's installation delays were discussed frequently during weekly conference calls with the operations team, which included office administrators, operation managers, permit coordinators, regional management staff, and Vivint Solar's Chief Executive Officer and Chief Operations Officer.  Delays existed from anywhere between two weeks and five months in length.  The installation delays were detailed in reports received by senior management, including Paul Dickson (Vice President of Sales) and Dan Rock (Vice President of Installation).  FE 5 would discuss installation delays with senior management, including Chance Allred, during weekly sales conference calls.

48.     Depending on the size of Vivint Solar's installation backlog, the Investment Funds would either reflect significant losses (due to the recognition of additional receivables and decreases in equity) or little-to-no losses at all due to the elimination of the receivables and restoration of the Investment Funds' equity.  (Registration Statement at 90.)  Given the fact that Vivint Solar closely monitored the progress of its solar energy system installations, Vivint Solar was aware of (or, at the very least, had access to) its then-current backlog of delayed installations as of October 1, 2014.  Accordingly, Vivint Solar knew at the time of the initial public offering that its HLBV calculation for the Investment Funds had dramatically changed since June 30, 2014.

49.     Vivint Solar's Registration Statement failed to disclose the impact of its Investment Funds on the Company's net income and earnings-per-share *as these figures existed when the Registration Statement became effective*.  Rather than disclose to investors that as of September 30, 2014 its net income available to common stockholders had decreased to ($35,278,000) and earnings-per-share had decreased to ($0.45), Vivint Solar proceeded with its initial public offering while misleadingly presenting investors with its strong, stable second-quarter earnings as of June 30, 2014.

50.     The Company's financials for the quarters-ended March 31, 2014 and June 30, 2014 created a misleading and/or inaccurate impression of the Company's finances as of the time of the initial public offering.  Compared to the Company's third-quarter earnings as of September 30, 2014, Vivint Solar's finances were materially different than those presented in the Registration Statement:

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | September 30, 2014 | June 30, 2014 | March 31, 2014 |
| | | (In thousands) | |
| Revenue: | | | |
| Operating leases and incentives | $ 7,131 | $ 5,804 | $ 2,863 |
| Solar energy system and product sales | 1,202 | 754 | 644 |
| Total revenue | 8,333 | 6,558 | 3,507 |
| Operating expenses: | | | |
| Cost of revenue—operating leases and incentives | 19,515 | 16,459 | 11,187 |
| Cost of revenue—solar energy system and product sales | 627 | 485 | 398 |
| Sales and marketing | 5,220 | 5,790 | 5,219 |
| Research and development | 431 | 500 | 472 |
| General and administrative | 37,170 | 13,752 | 12,354 |
| Amortization of intangible assets | 3,727 | 3,691 | 3,737 |
| Total operating expenses | 66,690 | 40,677 | 33,367 |
| Loss from operations | (58,357) | (34,119) | (29,860) |
| Interest expense | 3,261 | 2,673 | 1,401 |
| Other expense | 297 | 277 | 888 |
| Loss before income taxes | (61,915) | (37,069) | (32,149) |
| Income tax (benefit) expense | (10,222) | 2,542 | 4,394 |
| Net loss | (51,693) | (39,611) | (36,543) |
| Net loss attributable to non-controlling interests and redeemable non-controlling interests | (16,415) | (45,104) | (43,584) |
| Net (loss attributable) income available to common stockholders | $ (35,278) | $ 5,493 | $ 7,041 |
| Net (loss attributable) income available per share to common stockholders: | | | |
| Basic | $ (0.45) | $ 0.07 | $ 0.09 |
| Diluted | $ (0.45) | $ 0.07 | $ 0.09 |

(Registration Statement at p. 99, Form 10-Q at p. 3, Form 10-K at p. 59.)

51.     Between January 1, 2014 and June 30, 2014, Vivint Solar's net loss attributable to NCIs, net income available to common stockholders, and net income available per share to common stockholders remained relatively constant and stable.  In sharp contrast, between July 1, 2014 and September 30, 2014, the Company's NCI net loss decreased by $28.6 million (-63%),

net income available to common stockholders decreased by $40.7 million (-742%), and net income available per share to common stockholder decreased by $0.52 per share (-742%).

52.     Vivint Solar's Registration Statement should have disclosed the then-current state of its finances at the initial public offering.  First, this information was material and would have been considered by investors when deciding to invest in the Company.  Proof of this is evident from the stock market's reaction to the Company's third-quarter earnings announcement released initially by press release on November 10, 2014, and later by quarterly report (Form 10-Q) on November 12, 2014.

53.     The press release, issued after the close of the market on November 10, 2014, indicated that for the three-month period ended September 30, 2014, the Company's net loss attributable to NCIs had decreased to $16.4 million, net income available to common stockholders had dropped precipitously to negative $35,278,000, and net income available per share to common stockholder had plunged to negative $0.45 per share.  The press release also indicated that Vivint Solar had suffered a "Non-GAAP Earnings Before Non-Controlling Interests and Redeemable Non-Controlling Interests per Share" loss of ($0.66) per share, *which represented a negative 143% miss from analyst projections*.  In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.

54.     The Company's quarterly report (Form 10-Q) filed with the SEC after the market closed on November 12, 2014, reiterated the financial information contained within the press release.  (Form 10-Q at 27.)  With respect to the difference in Vivint Solar's net loss attributable to NCIs, Vivint Solar explained that: "Generally, gains and losses that are allocated to the fund investors under the HLBV method relate to hypothetical liquidation gains and losses resulting from

differences between the net assets of the investment fund and the partners' respective tax capital accounts in the investment fund.  Specifically, the decrease in net loss attributable to non-controlling interests and redeemable non-controlling interests was primarily due to the timing of our sale and subsequent installation of solar energy systems into certain investment funds.  Losses to the fund investors were also driven by a reduction in certain fund investors' claims on net assets due to the election of the partnership to take bonus depreciation allowances under Internal Revenue Code Section 179, as well as the receipt of ITCs that were primarily allocated to fund investors." (Form 10-Q at 29, 31.)  The Form 10-Q confirmed that the Company's earnings had been impacted materially by the operations of its Investment Funds.  In response to the Form 10-Q, Vivint Solar stock declined from $12.33 per share on November 12, 2014 to $11.70 per share on November 13, 2014, a decrease of $0.63 per share (approximately 5%), on unusually heavy volume.

55.     Vivint Solar's Registration Statement should have disclosed the Company's then-current state of finances, not just because the information was highly material, but also because the Company was required to do so under law and applicable accounting rules.

56.     Pursuant to the Securities Act of 1933, liability exists in instances where a registration statement filed with the SEC contains (i) a misrepresentation, (ii) an omission in contravention of an affirmative legal disclosure obligation, or (iii) an omission of information that is necessary to prevent existing disclosures from being misleading.  15 U.S.C. §§ 77k(a), 77l(a)(2). The Registration Statement provided investors with the Company's earnings as of June 30, 2014, in spite of the fact that the Company had already suffered extreme losses during the course of the third-quarter which had ended *prior* to the initial public offering.  By allowing investors to rely on the statements within the Registration Statement, Defendants failed to correct certain

misrepresentations and/or omissions concerning Vivint Solar's operations, finances, and earnings in violation of the Securities Act of 1933.

57.     Furthermore, by misrepresenting and/or omitting the Company's then-current financial state, Defendants failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP").  GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  The Financial Accounting Standards Board ("FASB") established the Accounting Standards Codification ("ASC") as the source of authoritative accounting principles to be applied by nongovernmental entities in preparing financial statements in conformity with GAAP. Compliance with GAAP is a fundamental obligation of publicly traded companies.  Accordingly, SEC Rule 4-01(a) of Regulation S-X [17 C.F.R. §210.4-01(a)(1)] provides that financial statements that are filed with the SEC and not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

58.     Pursuant to various accounting principles and standards, Vivint Solar's Registration Statement should have disclosed the Company's significant change in net loss and earnings that occurred between June 30, 2014 (the date of the last balance sheet) and October 1, 2014 (the date of the initial public offering).  For example, ASC 225-20-50 requires the disclosure of extraordinary and unusual items, which, if adhered to, would have caused the Registration Statement to reflect either or both the $100 million increase of Investment Funds assets and/or the effect of the Company's installation delays.  Additionally, FASB's Statement of Financial Accounting Standards No. 165, titled "Subsequent Events," requires entities to disclose subsequent events in order to keep financial statements from being misleading.  Had Defendants complied with this Statement of Financial Accounting Standard, then the Registration Statement would have

23

disclosed that the Company's net loss and earnings-per-share had deviated substantially and materially from the presented earnings history for the prior periods.

59.     Pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303), Vivint Solar was required to:

> (i)     Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii)     Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

60.     Vivint Solar's Registration Statement should have disclosed the volatile impact that its Investment Funds had on the Company's NCI loss, net loss, and earnings-per-share during the period of time between July 1, 2014 and October 1, 2014 as compared to the stable net income and earnings-per-share for earlier periods as presented in the Registration Statement.

61.     At the very least, Defendants should have cautioned investors that the Company's earnings history, as presented in the Registration Statement, were unreliable due to the volatile and severe impact of Vivint Solar's Investment Funds and the associated HLBV calculation.  In the Registration Statement, Vivint Solar only disclosed that:

> Attributing income and loss to the [NCIs] under the HLBV method requires the use of significant assumptions and estimates to calculate the amounts that fund investors would receive upon a hypothetical liquidation. Changes in these assumptions and estimates can have a significant impact on the amount that fund investors would receive upon a hypothetical liquidation.

Registration Statement at 122.

62.     The Registration Statement did not warn that changes in the assumptions and estimates used in the HLBV method, as well as other operations of the Investment Funds, could have a significant impact on the net income and earnings-per-share reported by Vivint Solar or that the operations of the Investment Funds and the assumptions and estimates used in the HLBV method for the three months ended September 30, 2014 would generate a substantial net loss and negative earnings-per-share for Vivint Solar's common stockholders.

63.     The Company has conceded that such a warning is necessary by adding such a warning in its annual report (Form 10-K) filed on March 13, 2015.  The Company added additional warning language to the warning that was contained in the Registration Statement, (Form 10-K):

> Attributing income and loss to the [NCIs] under the HLBV method requires the use of significant assumptions and estimates to calculate the amounts that fund investors would receive upon a hypothetical liquidation. Changes in these assumptions and estimates can have a significant impact on the amount that fund investors would receive upon a hypothetical liquidation. The use of the HLBV methodology to allocate income to the [NCIs] may create volatility in our consolidated statements of operations as the application of HLBV can drive changes in net income available and loss attributable to [NCIs] from quarter to quarter.

(Form 10-K at p. 58 (underline indicates new))

64.     The Registration Statement's discussion of its Investment Funds and its HLBV calculation failed to include any indication that the Company's net income and earnings-per-share had already been significantly damaged by the time of the initial public offering, let alone any explanation as to why or how the Investment Funds had the volatile impact they did.  The impact of the Investment Funds on the Company's net income and earnings-per-share was not only material, but was in stark contrast to the positive statements present within the Registration Statement.  Had Vivint Solar's offering materials disclosed that the Company's net loss and earnings-per-share suffered a massive negative swing, then investors would not have been misled

by the information contained within Vivint Solar's Registration Statement and Plaintiff (and other class members) would not have been damaged.

65.     Additionally, with respect to Vivint Solar's installation delays, the Registration Statement should have described the extent and impact of the Company's inability to timely install its solar energy systems.  The untimeliness and/or delay of Vivint Solar's installations and the impact they were having (and were likely to have) on the Company's Investment Funds and, in turn, its NCI losses, net loss, and earnings-per-share, constituted a "known trend[] or uncertaint[y]" pursuant to Item 303 of Regulation S-K.  Accordingly, Vivint Solar should have described these items in the Registration Statement.

**B.     Vivint Solar's Market Was Decreasing Due to Increasing Consumer Preference for First-Party Ownership**

66.     The second category of information that Vivint Solar either inadvertently or negligently omitted from the Registration Statement relates to the changing market for solar energy systems.  Specifically, Vivint Solar's Registration Statement failed to provide investors with an accurate description the market's shifting preference for outright purchasing and/or financing of solar energy systems (as opposed to long-term leases and power purchase agreements).

67.     The shifting preference for purchasing and/or financing is evident.  A number of reports and articles have been written regarding the topic.  For example, GTM Research, which Vivint Solar itself referred to for market research in its Registration Statement, released a report concerning the market for third-party ownership (*e.g.*, Vivint Solar's long-term leases and power purchase agreements) in June 2014 (the "GTM Research Report").  GTM Research provides market analysis in the form of research reports, data services, advisory services, and strategic consulting in the energy (and, specifically, solar) sector.  According to the GTM Research Report, written by Nicole Litvak, the third-party ownership model was predicted to peak in 2014 and

26

gradually lose market share to solar financing.  The change in preferences, according to GTM Research, was (and will be) due to the wide availability of solar financing options.

68.     Further to the point, an additional report from the National Renewable Energy Laboratory ("NREL"), further confirmed the changing market landscape while also explaining the underlying motivations.  NREL serves as the United States' primary laboratory for renewable energy and energy efficiency research and development.  NREL is owned by the United States government and is funded through the U.S. Department of Energy.  The report was written by David Feldman and Travis Lowder in November 2014, titled *Banking on Solar: An Analysis of Banking Opportunities in the U.S. Distributed Photovoltaic Market* (the "Solar Market Report").

69.     The Solar Market Report focuses on the emergence of solar loan financing arrangements, which differ from the third-party ownership model employed by Vivint Solar (*i.e.*, long-term leases and power purchase agreements).  The differences are as follows: first, in a solar financing arrangement, the homeowner would retain ownership of the solar energy system. Second, because the homeowner owns the solar energy system, the homeowner becomes eligible for the tax benefits and other incentives available to solar energy system owners.  Third, a solar energy system owner stands in a far better position in terms of adding equity to his or her property (relative to a lessee or power purchase agreement holder) due to the fact that the owner would be able to retain the system indefinitely.  Finally, the cost of the financing itself stands to be cheaper than a third-party ownership arrangement as the cost of capital in the third-party ownership arrangements begins to increase as the available tax incentives decrease.  (Solar Market Report at 11-12.)

70.     According to the Solar Market Report, solar loan financing has become more and more popular in recent times.  The increase in market share has, in part, been due an increase in

available lending options, increased stability with regard to lending to individuals, and the year-over-year declines in the costs associated with installing a solar energy system.  (Solar Market Report at 17.)  Between October 2013 and October 2014, at least nine new solar loan programs were announced by Admirals Bank, Digital Credit Union, Dividend Solar, Lightstream, Mosaic, OneRoof Energy, SolarCity, Sungage Financial, and WJ Bradley.  (Solar Market Report at 11.)

71.     In addition to analysts and governmental agencies identifying the trend away from third-party ownership, a number of Vivint Solar's former employees confirmed that the Company had been confronting the issue for some time.  For example:

- Former Employee 6 reported that Vivint Solar had been losing a considerable amount of customers due to the Company's refusal to offer purchasing alternatives.  FE 6 was a Vivint Solar Operations Manager in the San Francisco Bay Area (Concord, California) from July 2012 through December 2014.  He reported to Douglas Hatch, West Coast Regional Manager of Operations, and was responsible for managing installations throughout sales process.   FE 6 estimated that that he oversaw approximately 1,500 installations in 2014, and that he lost approximately 15% to 20% of potential customers due to the fact that Vivint Solar was unable to offer a direct purchasing option for the solar energy systems.  These customers were most concerned with the impossibility of ever owning the solar energy system, in spite of the fact that it would be installed on the homeowner's house for upwards of 20 years.

- Former Employee 7 worked as a Vivint Solar Sales Manager from January 2013 until November 2014.  FE 7 reported to Jared Slemboski, District Sales Manager for Northern California, and was responsible for training sales team and tracking sales objectives.  FE 7 corroborated FE 6 in that he too was able to state that Vivint Solar lost potential customers due to the fact that the Company did not offer a purchasing option.  FE 7 estimated that approximately 5% to 10% of his potential customers (approximately 200 installations) declined to sign with Vivint Solar because the Company did not offer a purchasing or financing option.

72.     Even Vivint Solar's largest competitor, SolarCity, was aware of the shift in the marketplace.  In October 2014, SolarCity revealed its "MyPower" financing program which was designed to assist its customers purchase its solar energy systems.  Lyndon Rive, SolarCity's Chief

Executive Officer, anticipated that half of SolarCity's revenue would be derived from solar financing by mid-2015.  As of January 2015, more than 8,000 customers have taken advantage of the "MyPower" financing program.

73.     The shifting preferences among Vivint Solar's potential customers did not become evident until the Company released its quarterly financials for the third quarter of fiscal 2014 in a press release issued after the market closed on November 10, 2014.

74.     The press release indicated significantly that although the Company's "Operating Leases and Incentives Revenue" for the third quarter ended September 30, 2014, was $7.1 million, Vivint Solar was forecasting significantly less for the fourth quarter of fiscal 2014.  Specifically, the press release indicated that the Company estimated fourth-quarter "Total Revenue" (as opposed to only "Operating Leases and Incentives Revenue") to equal between $5.5 million and $6.5 million.  Compared to the Company's "Total Revenue" for the quarter ended September 30, 2014, which was $8.3 million, the Company's forecasted revenue for the remaining quarter of the year was expected to decline by approximately 20% to 30%.

75.     Additionally, although the press release indicated that the Company installed 49 megawatts of solar energy systems (a key metric used by the Company to track the capacity of its solar energy systems) for the third quarter ended September 30, 2014, the Company was forecasting lower installations for the fourth quarter of fiscal 2014.  Specifically, the press release indicated that the Company was projecting 45 to 47 megawatts of installation.

76.     Collectively, the Company's third-quarter earnings and fourth-quarter guidance signaled to investors that growth would be slowing.  This slowdown in growth was, in turn, interpreted as evidence of the market's shift away from long-term leases and power purchase agreements in favor of solar financing (which Vivint Solar did not offer).

77.     In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.

78.     The evident, material shift in market preference away from long-term leases and power purchase agreements in favor of purchasing and financing qualified as either "unusual or infrequent events or transactions" or "known trends or uncertainties" pursuant to Item 303 of Regulation S-K.  Accordingly, Vivint Solar was required to describe these items in the Registration Statement.

79.     Vivint Solar either negligently omitted or failed to include an appropriate description of the then-current and likely future marketplace preferences for solar financing and purchasing (as opposed to Vivint Solar's long-term leases and power purchase agreements). Therefore, Defendants violated Regulation S-K.

C.      **Market Conditions In Hawaii Were Adverse to Vivint Solar's Operations**

80.     The third category of information that Vivint Solar either inadvertently or negligently omitted from the Registration Statement relates to the market for solar energy systems within Hawaii as it existed at the time of the IPO.  As of June 30, 2014, 15% of the Company's operations were confined to Hawaii.  (Registration Statement at 28.)  Accordingly, the market for Vivint Solar's solar energy systems in Hawaii was of particular importance to investors. Unbeknownst to investors at the time of the Registration Statement, the demand for solar energy systems in Hawaii was severely depressed due to market saturation and increasing regulation.

81.     Oahu is home to two-thirds of Hawaiian residents.  Oahu also represents Hawaii's largest solar energy system market and, at the time of the IPO, was heavily saturated.  In September 2013, Hawaiian electric utilities informed all solar energy contractors that that the electrical

circuits in the area had become oversaturated with residential rooftop solar energy systems. This was an issue of concern because the oversaturation was posing system and safety threats.[1]  In an article titled, *Hawaii solar boom so successful, it's been halted*, a utility spokesperson was quoted explaining that, "We can't allow circuits to become dangerous . . . .  We can't allow circuits to become unreliable because there's too much PV on those circuits."[2]  Following the electric utilities' notice to solar energy contractors, the market for residential solar energy systems slowed dramatically.[3]

82.  Shortly thereafter, Hawaii began instituting regulations aimed at slowing and/or decreasing solar energy generation.  In April 2014, the Hawaii Public Utility Commission (the "PUC") issued an order concerning reliability standards for Hawaii's electric utilities.  In that order, the PUC explained the necessity for new regulations concerning rooftop solar generation:

> The commission believes it is unrealistic to expect that the high growth in distributed solar PV capacity additions experienced in the 2010 - 2013 time can be sustained, in the same technical, economic and policy manner in which it occurred, particularly when electric energy usage is declining, distribution circuit penetration levels are increasing, system-level challenges are emerging and grid fixed costs are increasingly being shifted to non-solar PV customers.

> The commission submits that the distributed solar PV industry in Hawaii will, out of necessity due to their accomplishments thus far, have to migrate to a new business model not unlike what is expected for [electric utility] companies as a result of disruptive technologies. The distributed solar business model will need to shift from a customer value proposition predicated upon customers avoiding the grid financially - but relying upon it physically and thereby creating circuit and technical challenges -to a new model where the customer value-proposition is predicated upon how distributed solar PV benefits both individual customers and the overall electric system, and hopefully becomes a key contributor to Hawaii's grid modernization, and most importantly as a consequence, customers are compensated by the electric utility for the grid value created.[4]

---

[1] David Thompson, *Hawaii's Solar Energy Revolution*, HONOLULU MAGAZINE, February 19, 2014.
[2] Anne C. Mulkern, *Hawaii solar boom so successful, it's been halted*, CLIMATEWIRE, December 20, 2013.
[3] *Id*.
[4] *In the Matter of Public Utilities Commission*, Docket No. 2011-0206, Order No. 32053 (April 28, 2014), ¶¶ 34-35.

83.     The PUC's order resulted in a demand for new regulation aimed at accommodating the dramatic increase in Hawaiian solar energy.  Among the regulations proposed in response was a reform concerning net metering rules.  (Traditionally, net metering has been a system whereby a homeowner producing solar energy is permitted to sell solar electric to the utility company in exchange for an offset on his or her utility bill.)  The reform required all electric utility customers to pay a fee of $50-$71 per month plus a kWh charge for electricity consumed from the electric utility.  In addition, any customer selling electricity back to the electric utility under net metering would be charged an additional $16 fee each month for the privilege.  Further, the rate at which the electric utility purchases the customer-generated solar power would change from the retail rate to the utility's "avoided cost" or wholesale cost, which was much less than the retail rate and would accordingly yield substantially less benefits to the customer.[5]

84.     On August 26, 2014, approximately one month before the Registration Statement went effective, Hawaiian utilities filed plans with the PUC codifying the regulatory regime outlined above.  These plans stipulated three major changes to Hawaiian solar energy:

- A fixed monthly charge applied to all customers, allocating fixed customer service and demand costs in a fair, equitable and revenue-neutral manner within customer classes;

- An additional fixed monthly charge applied only to new DG customers to account for additional standby generation and capacity requirements provided by the electric utility; and

- A "Gross Export Purchase model" for export DG. Under this model, coincident self-generation from DG-PV and usage is not metered and customers sell excess electricity near wholesale rates and buy additional electricity at variable retail rates.[6]

---

[5] Stephen Lacey, *As Hawaii Prepares for Utility Reform, the State's Solar Industry Sheds 3,000 Workers*, GREENTECH MEDIA (Sept. 25, 2014).
[6] Joseph P. Viola, Response to Hawaii Public Utilities Commission Order No. 32053, August 26, 2014.

85.     The net effect of the oversaturation and increased regulation has also led to a dramatic decline in employment within the Hawaiian solar energy sector.   During 2014, approximately 3,000 solar energy employees lost their jobs.[7] Further, the number of permits issued for new rooftop solar energy systems dropped to less than 50% of the permits issued in the previous year.[8]

86.     The effects of Hawaii's tightening regulations have been noticed, and well-documented.   Pacific Business News ("PBN"), an American City Business Journal publication focusing on Hawaiian current business news, published a number of articles detailing Hawaii's solar energy market throughout 2014 and into 2015:

- *Oahu solar PV permits decline for eighth straight month* (January 9, 2014). PBN reports that, for December 2013, Oahu issued 1,140 permits, a 41% drop from December 2012.   "The issue of interconnecting systems to Hawaiian Electric Co's grid has been and still continues to plague the industry, once known as one of the fastest growing sectors in Hawaii. . . . . Of the top 15 [solar] firms, in terms of number of permits issued in 2013, only four contractors saw their numbers increase last month when compared to December 2012.  These companies included Hawaii Energy Connection, SolarCity, EcoSolar, and Hawaiian Island Solar.  The firms which saw the largest declines in December permits, when comparing year-over-year numbers, included Bonterra Solar, Vivint Solar, and Haleakala Solar."

- *Honolulu solar PV industry showing mixed signs so far this year* (February 5, 2014).  PBN reports that the total number of residential solar energy system permits issued had decreased by 25% as compared with the same week in the prior year, according to statistics from the Hawaii Department of Business, Economic Development and Tourism.

- *Honolulu issues 51% fewer solar PV permits in April* (May 15, 2014).  PBN reports that permit issuances by the City and County of Honolulu have declined year-over-year for the thirteenth straight month in a row.    Total permit issuances equaled 577 permits, compared to 1,178 in the same month during the previous year.

---

[7] Stephen Lacey, *As Hawaii Prepares for Utility Reform, the State's Solar Industry Sheds 3,000 Workers*, GREENTECH MEDIA (Sept. 25, 2014).
[8] *Id.*

- *Permits reflect slowing of solar industry* (June 13, 2014).  PBN reports that Honolulu saw the "lowest number of solar PV permits issued in the past two years in May, according to Marco Mangelsdorf, president of Hilo-based ProVision Solar, who collects the information from the City and County of Honolulu.  'No relief appears to be in sight for the declining PV permit numbers as contractors downsize their work force by as much as 50 percent,' he said."  Relative to the same period for the previous year, permits had declined by 46% year-over-year.

- *Oahu's solar PV industry continues slowdown on permitting side* (August 18, 2014).  PBN reports that "Oahu's solar photovoltaic industry continues to flounder, in terms of the number of permits issued, as July became the 15th straight month of year-over-year decline . . . ."  Marco Mangelsdorf, president of ProVision Solar, notes that Vivint Solar's permit record does not necessarily coincide with the number of successful installations considering "given grid constraints.  Some companies obtain the permits right after the sale.  Some wait [until] Hawaiian Electric approval."

- *Oahu solar PV permits in August hit lowest number in three years* (September 8, 2014).  PBN reports that "Oahu's solar energy industry saw the fewest number of permits for solar photovoltaic systems in three years issued in August . . . ."  Oahu issued 410 permits in August, nearly a 70% drop as compared with the same period in the prior year.  "'It's likely that the climate for the island's solar electric contractors is even darker than these numbers indicate since a number of these contractors are pulling permits, and in some cases actually installing and energizing systems, before receiving utility approval,' [Marco] Mangelsdorf said in an email to PBN."

87.     Contrary to the above facts regarding the Hawaiian market for solar energy, Vivint Solar's Registration Statement described it as "significantly underpenetrated."  (Registration Statement at 83.)  The Registration Statement stated, in pertinent part, that:

### Expansion into New Markets

        We currently operate in Arizona, California, Hawaii, Maryland, Massachusetts, New Jersey and New York. We have chosen to initially introduce our solar energy systems in these states because the utility prices, sun exposure, climate conditions and regulatory policies in these states provide for the most compelling market for distributed solar energy. We believe that these states remain significantly underpenetrated. Accordingly, we intend to further penetrate these markets by introducing our solar energy systems into new neighborhoods and communities in states where we already have operations.

34

(Registration Statement at 83.)

88.     The Registration Statement contained additional statements that inaccurately represented the status of the Hawaiian market, such as Vivint Solar's description of Hawaii in the section titled "Market Opportunity."  The "Market Opportunity" section leads with several bold statements, such as that "[t]he market for residential distributed solar energy is growing rapidly and disrupting the traditional electricity market."  (Registration Statement at 125.)  The Registration Statement then provides several statistics concerning total megawatt installations, and that these installations are expected to increase exponentially through 2018.  (Registration Statement at 125.)  At the same time, the Registration Statement advises investors that the "market possesses significant growth opportunities as compared to the total U.S. electricity market, as distributed solar has penetrated less than 1% of its total addressable market in the residential sector."  (Registration Statement at 125.)  The Registration Statement then discusses the increasing costs of traditional electricity, specifically within Hawaii where (according to the Registration Statement) "utility rates" have increased by 55% from 2007 to 2012.  (Registration Statement at 125-26.)  These statements, collectively, indicated to investors that the potential for market growth within Hawaii was exceedingly strong.  This, of course, was not the case at the time of the initial public offering.

89.     Immediately after advising investors that 53% and 15% of the Company's total installations had been in California and Hawaii, Vivint Solar noted that it "expect[ed] much of [its] near-term future growth to occur in California, further concentrating our customer base and operational infrastructure.  Accordingly, our business and results of operations are particularly susceptible to adverse economic, regulatory, political, weather and other conditions in such markets and in other markets that may become similarly concentrated."  (Registration Statement

at 28.)  Absent from this disclosure is an appropriate description of the then-current state of

Hawaii's solar energy market.  By omitting this information, the Registration Statement reinforced

the untrue and/or inaccurate statements above concerning Hawaii's "significant[]"

underpenetrat[ion]."

90.     Even the Registration Statement's limited cautionary language concerning

"regulatory limitations" was misleading with regard to the Hawaiian market.  The Registration

Statement stated, in pertinent part, that:

> Hawaiian electric utilities have adopted certain policies that limit distributed
> electricity generation in *certain geographic areas*. While these limits have
> constrained our growth in Hawaii, legislative and regulatory developments in
> Hawaii have generally allowed distributed electricity generation penetration
> beyond the electric utility imposed limitations. Future revisions, however, could
> result in limitations on deployment of solar energy systems in Hawaii, which
> accounted for approximately 15% of our total installations as of June 30, 2014 and
> would negatively impact our business. Furthermore, in certain areas, we benefit
> from policies that allow for expedited or simplified procedures related to
> connecting solar energy systems to the power grid. If such procedures are changed
> or cease to be available, our ability to sell the electricity generated by solar energy
> systems we install may be adversely impacted.

(Registration Statement at 24 (emphasis added).)

91.     This cautionary language fails to disclose that the "certain geographic areas"

referenced in the Registration Statement encompasses not just Oahu (which counts for two-thirds

of Hawaii's population), but also Maui and the Big Island.  (Anne C. Mulkern, *Hawaii solar boom

so successful, it's been halted*, CLIMATEWIRE, December 20, 2013 ("The HECO policy is only for

Oahu, but a similar rule already is in effect on Maui and the Big Island.  It's more controversial on

Oahu, however, because it's home to about 80 percent of the state's population.  About 900,000

people live on Oahu.").)  Had the Registration Statement been accurate, the above language would

have indicated that virtually all of Hawaii was subject to "limits" that had already "constrained

[Vivint Solar's] growth in Hawaii," and that "legislative and regulatory developments in Hawaii" would continue to "negatively impact" the Company's business within the State.

92.     The true state of the Hawaiian solar energy market did not become evident until the Company released its quarterly financials for the third quarter of fiscal 2014 in a press release issued after the market closed on November 10, 2014 and the Company's quarterly report on Form 10-Q after the market closed on November 12, 2014.

93.     The press release indicated significantly that although the Company's "Operating Leases and Incentives Revenue" for the third quarter ended September 30, 2014, was $7.1 million, Vivint Solar was forecasting significantly less for the fourth quarter of fiscal 2014.  Specifically, the press release indicated that the Company estimated fourth-quarter "Total Revenue" (as opposed to only "Operating Leases and Incentives Revenue") to equal between $5.5 million and $6.5 million.  Compared to the Company's "Total Revenue" for the quarter ended September 30, 2014, which was $8.3 million, the Company's forecasted revenue for the remaining quarter of the year was expected to decline by approximately 20% to 30%.

94.     Additionally, although the press release indicated that the Company installed 49 megawatts of solar energy systems (a key metric used by the Company to track the capacity of its solar energy systems) for the third quarter ended September 30, 2014, the Company was forecasting lower installations for the fourth quarter of fiscal 2014.  Specifically, the press release indicated that the Company was projecting 45 to 47 megawatts of installation.

95.     Furthermore, the Company's quarterly report (Form 10-Q) for the third-quarter revealed that, as of September 30, 2014, approximately 12% of the Vivint Solar's cumulative installations were in Hawaii, down from 15% as of June 30, 2014.  (Form 10-Q at 43.)

96.     Collectively, the Company's third-quarter earnings and fourth-quarter guidance signaled to investors that growth would be slowing.  This slowdown in growth was, in turn, interpreted as evidence of Hawaii's adverse market conditions due to oversaturation and increased regulation.

97.     In response to the press release, Vivint Solar stock declined from $14.74 per share on November 10, 2014 to $11.42 per share on November 11, 2014, a decrease of $3.32 per share (approximately 22.5%), on unusually heavy volume.

98.     Further evidence of Hawaii's adverse market conditions was contained within the Company's Form 10-Q, which indicated that the Company's operations in Hawaii had declined to 12% from 15%.  (Form 10-Q at 39.)

99.     In response to the Form 10-Q, Vivint Solar stock declined from $12.33 per share on November 12, 2014 to $11.70 per share on November 13, 2014, a decrease of $0.63 per share (approximately 5%), on unusually heavy volume.

100.    Considering that as of June 30, 2014, 15% of the Company's operations were confined to Hawaii, the Registration Statement's statements concerning Hawaii as well as the then-current state of the Hawaiian solar energy market were of significant importance to investors.  The Registration Statement should have contained a materially accurate description of the Hawaiian solar energy market as it existed at the time of the IPO.  Vivint Solar either negligently omitted or failed to include an appropriate description of the then-current and likely future market for solar energy within Hawaii.  Accordingly, Defendants violated the Securities Act.

101.    The economic changes within Hawaii, a geographical area comprising 15% of Vivint Solar's operations at the time of the IPO, were having a material impact on the Company's operations within that state.  Further, given the nature of the economic changes, it was reasonably

likely that they would continue to material impact the Company's operations going forward.  And

they did—as of December 31, 2014, only 10% of Vivint Solar's cumulative installations were

within Hawaii.  (Form 10-K at 15.)  Defendant Butterfield further confirmed the continued impact

of Hawaii's strict regulatory environment in a January 2015 interview with PBN.  The interview,

which PBN reported on January 22, 2015 in an article titled *Utah's Vivint Solar has backlog of*

*1,500 photovoltaic systems in Hawaii*, discussed the fact that Vivint Solar had amassed a backlog

of 1,500 uninstalled solar energy systems in Hawaii (*i.e.*, 1,500 Vivint Solar customers remained

waiting to have their solar energy systems connected to Hawaiian Electric Co.'s grid).  As reported

by PBN, Defendant Butterfield acknowledged the continuing "challenges" faced by the Company

with regard to Hawaiian utilities.  PBN also noted that, although Vivint Solar routinely pulled

about 92 permits per month between January and September 2014, the Company pulled nine and

15 permits in October and November, respectively.

102.    Hawaii's solar energy market, and the events taking place therein at the time of the

IPO, qualified as either "unusual or infrequent events or transactions" or "known trends or

uncertainties" pursuant to Item 303 of Regulation S-K.  Accordingly, Vivint Solar was required to

describe these items in the Registration Statement.  Vivint Solar either negligently omitted or failed

to include an appropriate description of the then-current and likely future market for solar energy

within Hawaii.  Accordingly, Defendants violated Regulation S-K.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff bring this action on behalf of all individuals and entities who purchased or

otherwise acquired Vivint Solar securities in connection with and/or traceable to the Company's

IPO and were damaged, excluding the defendants and each of their immediate family members,

legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

104.     The members of the Class are so numerous that joinder of all members is impracticable.  Vivint Solar securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vivint Solar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon completion of the IPO, Vivint Solar had 105,303,122 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

105.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

106.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

107.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by Defendants' respective acts as

alleged herein;

(b)     whether the Defendants acted negligently; and

(c)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

108.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### The Defendants Violated Section 11 of the Securities Act

109.     Plaintiff repeats and realleges the allegations contained above.

110.     As set forth above, Vivint Solar's Registration Statement contained untrue and/or incorrect statements of material fact and omitted material facts required to be stated in order to make the statements contained therein accurate.

111.     Vivint Solar is the registrant for the IPO.  As issuer of the shares, Vivint Solar is strictly liable to Plaintiff and to the members of the Class for the materially untrue statements and omissions alleged herein.

112.     Vivint Solar's Registration Statement was signed by Defendant Butterfield on behalf of the Company.

113.     The Individual Defendants each appointed Defendants Butterfield and Russell as their true and lawful attorneys-in-fact and agents for the purpose of "sign[ing] any and all amendments (including post-effective amendments) to [the Registration Statement] and any and all additional

registration statements and amendments thereto filed pursuant to Rule 462(b) of the Securities Act of 1933 . . . ."  The Individual Defendants signed or authorized others to sign the Registration Statement on their behalf.

114.    The Individual Defendants were directors of or partners in Vivint Solar at the time of the filing of the Registration Statement.

115.    The Individual Defendants were named in the Registration Statement as being or about to become a director of, or person performing similar functions in, the Vivint Solar.

116.    The Underwriter Defendants were underwriters with respect to the Vivint Solar securities offered in the IPO.

117.    Plaintiff and the other members of the Class purchased Vivint Solar securities in or traceable to the IPO.

118.    Plaintiff and the other members of the Class were damaged by Vivint Solar, the Individual Defendants, and the Underwriter Defendants as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

119.    This claim was brought within the applicable statute of limitations.

120.    By reason of the foregoing, Vivint Solar, the Individual Defendants, and the Underwriter Defendants have violated Section 11 of the Securities Act and are liable to Plaintiff and the other members of the Class.

### COUNT II

**The Underwriter Defendants Violated Section 12(a)(2) of the Securities Act**

121.    Plaintiff repeats and realleges the allegations contained above.

122.    The Underwriter Defendants agreed to severally purchase certain amounts of shares in the initial public offering.  These amounts were indicated in the Registration Statement as follows:

| Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co. | 4,682,380 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 4,682,380 |
| Credit Suisse Securities (USA) LLC | 3,407,240 |
| Citigroup Global Markets Inc. | 1,957,000 |
| Deutsche Bank Securities Inc. | 1,957,000 |
| Morgan Stanley & Co. LLC | 1,957,000 |
| Barclays Capital Inc. | 1,369,900 |
| Blackstone Advisory Partners L.P. | 587,100 |
| Total | 20,600,000 |

(Registration Statement at 205)

123.    According to the Underwriter Defendants' agreements with the Company, the Underwriter Defendants "committed" to take and pay for all of the shares being offered.  If the Underwriter Defendants sold more than 20.6 million shares, then they were permitted to exercise an option to buy 3,090,000 shares to cover additional sales.

124.    The Underwriter Defendants offered or sold Vivint Solar securities by the use of means or instruments of transportation or communication in interstate commerce or the mails.

125.    The Underwriter Defendants offered or sold Vivint Solar securities by means of a prospectus or oral communication.

126.    As set forth above, the prospectus or oral communication by which the Underwriter Defendants offered or sold Vivint Solar securities contained an untrue statement of a material fact and omitted to state a material fact necessary in order to make the statements not misleading.

127.    Members of the Class, whom Plaintiff represents herein, purchased Vivint Solar securities directly from the Underwriter Defendants pursuant to the Registration Statement.

128.     As set forth above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements accurate.

129.     Members of the Class, whom Plaintiff represents herein, did not know that the Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements accurate.

130.     Those members of the Class who purchased Vivint Solar securities in the IPO directly from the Underwriter Defendants have sustained damages as a result of the untrue statements of material facts and omissions in the Registration Statement, for which they hereby elect to rescind and tender their shares of Vivint Solar common stock in return for the consideration paid for Vivint Solar common stock with interest or seek rescissory damages.

131.     This claim was brought within the applicable statute of limitations.

132.     By virtue of the foregoing, the Underwriter Defendants have violated Section 12(a)(2) of the Securities Act.

## COUNT III

### The Individual Defendants Violated Section 15 of the Securities Act

133.     Plaintiff repeats and realleges the allegations contained above.

134.     Each of the Individual Defendants participated in the operation and management of Vivint Solar at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Vivint Solar's business affairs.

135.     Each of the Individual Defendants was involved in the day-to-day operations of the Company at the highest levels.

136.     Each of the Individual Defendants was privy to confidential proprietary information concerning the Company and its business and operations.

137.    The Individual Defendants were senior officers and directors of Vivint Solar.  Due to their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

138.    The Individual Defendants each signed, or caused to be signed on their behalf, the Registration Statement.

139.    The Individual Defendants were controlling persons of Vivint Solar under the Securities Act.

140.    Vivint Solar's conduct, as alleged herein, constitutes a violation of Sections 11 and 12(a)(2) of the Securities Act.  The Individual Defendants are liable to Plaintiffs and the other members of the Class, jointly and severally with and to the same extent as Vivint Solar, for violations under Section 15 of the Securities Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding rescission and/or rescissory damages, in an amount to be proven at trial, to all members of the Class who purchased shares of Vivint Solar

common stock directly from the Underwriter Defendants in the IPO;

(d)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

(e)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated:  April 6, 2015                LEVI & KORSINSKY LLP

/s/ Nicholas Porritt
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (866) 367-6510

*Attorneys for Lead Plaintiff*
*Robby Shawn Stadnick and Lead*
*Counsel for Class*

4844-5454-0322, v.  3