UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                                                         :

ROBBY SHAWN STADNICK, individually and   :
on behalf of all others similarly situated,       :
                                                          :

                             Plaintiff,     :                14-cv-9283 (KBF)
                                                          :                14-cv-9709 (KBF)

                  -v-                      :
                                                          :

VIVINT SOLAR, INC., et al.,                  :        OPINION & ORDER
                                                           :

                            Defendants.     :
---------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

      Plaintiff Robby Shawn Stadnick, on behalf of himself and as representative of a purported class, brings this action against Vivint Solar, Inc. ("Vivint Solar" or "the Company"), its largest stockholder, Blackstone Group, L.P., a number of individual officers and directors (the "Individual Defendants"[1]), and a syndicate of underwriters (the "Underwriter Defendants"[2]), for securities law violations in connection with the Company's initial public offering ("IPO") on October 1, 2014. (SAC[3] ¶ 1.)  Pursuant to the IPO, the Company sold 20,600,000 shares of its common stock at $16 per share, raising net proceeds of $300.8 million. (Id. ¶ 29.)

---

[1] The Individual Defendants include Gregory S. Butterfield who at the time of the IPO was the Chief Executive Officer, President, and a director, Dana C. Russell, who at the time of the IPO was the Chief Financial Officer, and David F. D'Alessandro, Alex J. Dunn, Bruce McEvoy, Todd R. Pedersen, Joseph F. Trustey, Peter F. Wallace, and Joseph S. Tibbetts, who at the time of the IPO were directors.  (SAC ¶¶ 19-22.)

[2] The Underwriter Defendants include Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Inc., Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Morgan Stanley & Co. LLC, Barclays Capital Inc., and Blackstone Advisory Partners L.P.  (SAC ¶ 23.)  The Underwriter Defendants both joined in the arguments submitted by Vivant Solar and the Individual Defendants, and submitted their own memoranda in support of this motion. (ECF Nos. 68.)

[3] The notation "SAC" refers to plaintiff's Second Consolidated Amended Complaint for Violation of the Federal Security Laws, available at ECF No. 58.

Plaintiff asserts that Vivint Solar issued a misleading Registration Statement in connection with its IPO.  (<u>Id.</u> ¶ 1.)  The core of plaintiff's claim is that the Registration Statement inaccurately portrayed the Company as a good investment with consistently positive net income and earnings-per-share and a strong qualitative description of operations by omitting three material pieces of information:  a "massive negative swing in earnings" in the third fiscal quarter that ended the day before the IPO; increasing regulatory constraint on the Company's operations in Hawaii, its second biggest market; and changes in consumer preferences within the residential solar energy market.  Plaintiff alleges that these omissions violated §§ 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C §§ 77k(a), 77*l*(a), and 77o(a) (2012).  (<u>Id.</u> ¶¶ 109-40.)

Now before the Court are defendants' motions to dismiss plaintiff's Second Consolidated Amended Complaint (SAC) for failure to state a claim upon which relief can be granted.  (ECF Nos. 64 & 67.)  For the reasons set forth below, those motions are GRANTED.

I.      FACTUAL BACKGROUND[4]

      A.      <u>Vivint Solar's Business Model</u>

Vivint Solar is a residential solar energy unit installer that leases solar energy systems to homeowners.  (SAC ¶ 2.)  It operates in a number of states including California, Hawaii, Arizona, Massachusetts, New Jersey and New York.  (<u>Id.</u> ¶ 16.)  As of June 30, 2014, over 50% of its total installations were in California, and 15% were in Hawaii.  (<u>Id.</u>)  The majority of its offices – 21 of 37 – were located in these two states alone. (<u>Id.</u>)

The Company's business model is premised on its ownership of solar energy equipment installed on residential homes, with homeowners entering into long-term – typically 20 year – leases for power.  (<u>Id.</u> ¶¶ 25, 26.)   Vivint Solar's customers pay little to no money upfront and pay 15-30% less for their power than they would for utility-generated electricity.  (<u>Id.</u> ¶ 25.)  The fundamental revenue stream for the Company is homeowners' monthly payments for power over the lives of the leases.  (<u>Id.</u> ¶ 26.)  Because Vivint Solar retains ownership of the systems, it qualifies for various tax credits and other local, state, and federal incentives.  (<u>Id.</u>)

---

[4] In evaluating whether plaintiff has stated a claim, this Court considers the allegations of the SAC, as well as document incorporated by reference therein.  <u>See, e.g.</u>, <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002).  The SAC identifies and incorporates a number of such materials, including Vivint Solar's filings with the Securities and Exchange Commission ("SEC"), regulatory filings and reports, securities analyst reports, press releases and other public statements issued by the Company, and other media reports about the Company.  (SAC p. 1.)  The incorporated materials include most notably the Company's Registration Statement (ECF No. 66, Exh. A), Form 10-K for the year ended December 31, 2014 (<u>Id.</u>, Exh. B), Form 10-Q for the quarter ended September 30, 2014 (<u>Id.</u>, Exh. J), and analyst reports issued in October and November (<u>Id.</u>, Exhs. F, K).  The SAC also references a report by GTM Research, issued in June 2014, entitled "U.S. Residential Solar Financing," and another by the National Renewable Energy Laboratory, issued in November 2014, entitled "The Solar Market Report". (<u>Id.</u>, Exhs. C, D.)

Because Vivint Solar's customers pay little to no money upfront, the Company needs access to capital to purchase, install, and maintain the systems. Prior to the IPO, Vivint Solar had raised cash through at least 10 Investment Funds. (Id. ¶ 27.) In return for substantial cash commitments, these Funds have interests in the long-term payment stream generated by homeowner payments. (Id. ¶ 28.) The contracts between the Company and the Investment Funds provide that after the systems a Fund finances are installed, the bulk of the homeowner payment revenues go to the Fund until, depending on the contract's structure, either the Fund achieves a targeted rate of return or the recapture period associated with certain investment tax credits expires, at which point the percentages "flip" and the Company began to receive most of the revenues. (Id. ¶ 37; RS[5] 89.)

Vivint Solar calculates its net income available or loss attributable to common stockholders by first calculating its overall net income or loss and then subtracting the net loss attributable to non-controlling interests and redeemable non-controlling interests (together referred to as "NCIs"). (SAC ¶ 50; RS 99.) Loss attributable to NCIs are allocable to Fund investors, as opposed to the Company itself. (SAC ¶ 36.) Vivint Solar calculates the net loss attributable to NCIs using an accounting method known as Hypothetical Liquidation at Book Value ("HLBV"). (SAC ¶ 36.) Under HLBV, the net loss attributable to NCIs for a period is the change in the amount the Funds' investors would hypothetically receive under the

---

[5] The notation "RS" refers to Vivint Solar's Registration Statement, available as ECF No. 66, Exh. A.

liquidation provisions of the Funds' contractual agreements, after taking into account any capital transactions between the Funds and the investors.  (RS 88-89.)

The Company's combined use of Investment Funds and the HLBV accounting method makes timing important to the Company's balance sheets.  At times a Fund's investors contribute cash to pay for the installation of solar energy systems prior to the actual installation of the systems.  (SAC ¶ 43; RS 90.)  When this occurs, the Company assigns the uninstalled system an asset value of zero and the Fund reflects a receivable, representing its eventual right to receive solar panels.  (RS 90.)  In order to account for this receivable, the Fund's member's equity is reduced; that is, the Fund investor has a loss.  (SAC ¶ 43; RS 90.)  When the purchased solar energy system is eventually installed the receivable is eliminated and the Fund's member's equity is increased, reversing the earlier loss.  (SAC ¶ 43; RS 90.)

The Blackstone Group L.P. (Blackstone) is an investment firm that owns a majority interest in Vivint Solar.  (SAC ¶¶ 17-18.)  Blackstone controlled 97% of the Company's common stock prior to the IPO and 78% after the IPO.  (Id. ¶ 18.)

B.    The Registration Statement

Vivint Solar sought capital on the public equity markets starting in 2014. (Id. ¶ 29.)  In connection with its IPO it submitted and revised a Registration Statement, which the Securities and Exchange Commission ("SEC") declared effective on September 30, 2014, the day before the Company's October 1, 2014 IPO.

(Id.)  Plaintiff's claims turn on the whether this Registration Statement contained material misstatements or omissions.

The Registration Statement provides extensive information about the risks of investing in Vivint Solar.  On page 8, within the Prospectus Summary, the Statement summarizes risks including, inter alia, the Company's "need to enter into substantial additional financing arrangement," "electric utility industry policies and regulations," the Company's reliance on "net metering[6] and related policies to offer competitive pricing," a "material weakness in [the Company's] internal control over financial reporting," and the challenges of "attracting, training and retaining sales personnel and solar energy system installers."  (RS 8.)

The Risk Factors section of the Registration Statement begins on page 19 and runs for 39 pages.  (Id. 19-58.)  The first risk listed, to which the Statement returns a number of times, relates to the Company's financing arrangements with its Investment Funds.  (SAC ¶ 28; RS 19.)  The Company disclosed that its "future success depends on [its] ability to raise capital from third-party investors on competitive terms to help finance the deployment of [its] solar energy systems."  (RS 19.)

The Registration Statement also addressed the possibility that regulations governing the electric utility industry and that industry's policies "could result in a significant reduction in the potential demand for electricity from [the Company's]

---

[6] "Net metering allows a homeowner to pay his or her local electric utility only for their power usage net of production from the solar energy system . . . .  Homeowners receive credit for the energy that the solar installation generates to offset energy usage at times when the solar installation is not generating energy."  (RS 23.)

solar energy systems and could deter customers from entering into contracts with [the Company]." (Id. 21.)  One regulatory issue the Registration Statement highlighted was the Company's reliance on favorable net metering policies, the absence of which "would significantly limit customer demand for [the Company's] solar energy systems." (Id. 23.)  The Statement noted that, under California regulations, systems installed before the earlier of July 2017 or the fulfillment of a "statutory net metering cap" would be grandfathered in to the current favorable net metering rules for 20 years, but later-installed systems would not.  (Id.)

The Risk Factors section also highlighted the specific risk of regulatory limitations in "certain key markets." (Id. 24.)  Regarding Hawaii, the Registration Statement explained that

> Hawaiian electric utilities have adopted certain policies that limit distributed electricity generation in certain geographic areas.  While these limits have constrained [the Company's] growth in Hawaii, legislative and regulatory developments in Hawaii have generally allowed distributed electricity generation penetration beyond the electric utility imposed limitations.  Future revisions, however, could result in limitations on deployment of solar energy systems in Hawaii, which accounted for approximately 15% of [the Company's] total installations as of June 30, 2014 and would negatively impact [the Company's] business.

(Id.)  A few pages later, the importance of the Hawaii and California markets was re-emphasized and quantified:  "As of June 30, 2014, approximately 53% and 15% of [the Company's] total installations were in California and Hawaii, respectively, and 21 of [its] 37 offices were located in those states.  In addition, [the Company] expect[s] much of [its] near-term future growth to occur in California, further concentrating [its] customer base and operational infrastructure." (Id. 28.)

7

Outside of the Risk Factors section, however, the Statement was more positive about the California and Hawaii markets. One of the factors the Company predicted would affect its performance was its ability to expand into new markets beyond the seven states in which it already operated.[7] (Id. 83.) However, the Company did note its belief that those seven states, including California and Hawaii, "remain[ed] significantly underpenetrated," (id.) and noted that utility rates in Hawaii increased 55% from 2007 to 2012 and that "in the past 20 years, the combined average residential utility rate in our top markets of California and Hawaii ha[d] doubled." (Id. 126.)

Another disclosed risk stemmed from Vivint Solar's "limited operating history," which, "combined with the rapidly evolving and competitive nature of [its] industry, may not provide an adequate basis for [a potential purchaser of stock] to evaluate [the Company's] operating and financial results and business prospects." (Id. 28.) The Company warned that it had "limited insight into emerging trends that may adversely impact [its] business, prospects and operating results." (Id.)

Vivint Solar also disclosed that it had "incurred operating losses since [its] inception," including "net losses of $56.5 million and $76.2 million for the year ended December 31, 2013 and the six months ended June 30, 2014, respectively." (Id. 30.) The Registration Statement also noted that the Company "expect[ed] to continue to incur net losses from operations as [it] increase[d] [its] spending to finance the expansion of [its] operations, expand [its] installation, engineering,

---

[7] Arizona, California, Hawaii, Maryland, Massachusetts, New Jersey, and New York. (RS 83.)

administrative, sales and marketing staffs, and implement internal systems and infrastructure to support [its] growth." (<u>Id.</u>)

Another set of risks the Registration Statement disclosed concerned Vivint Solar's "need to hire, train, deploy, manage and retain a substantial number of skilled installers and electricians." (<u>Id.</u> 32.)  These staffing requirements, the Company explained, could prevent it from "complet[ing] [its] customers' projects on time, in an acceptable manner or at all." (<u>Id.</u> 33.)

The Risk Factor section of the Statement also warned that Vivint Solar's "operating results may fluctuate from quarter to quarter, which could make [its] future performance difficult to predict and could cause [its] operating results for a particular period to fall below expectations, resulting in a severe decline in the price of [the Company's] common stock." (<u>Id.</u> 36.)  The Company had "experienced seasonal and quarterly fluctuations in the past," and "the true extent of these fluctuations may have been masked by [the Company's] recent growth rates and thus may not be readily apparent from [its] historical operating results and may be difficult to predict." (<u>Id.</u>)  The Registration Statement listed a number of factors which, "[i]n addition to the other risks described in this 'Risk Factors' section … could cause [the Company's] results to fluctuate."  Those factors included "significant fluctuations in customer demand for our offerings" and the Company's "ability to complete installations in a timely manner." (<u>Id.</u>)  "For these or other reasons," the Statement continued,

> the results of any prior quarterly or annual periods should not be relied upon as indications of [Vivint Solar's] future performance.  In

9

addition, [the Company's] actual revenue, key operating metrics and
other operating results in future quarters may fall short of the
expectations of investors and financial analysts, which could have an
adverse effect on the trading price of [its] common stock.

(Id. 37.)

Another section of the Statement presented selected consolidated financial

data.  (Id. 67-70.)  The table below presents selections of this data.

|  | Jan 1 – Nov. 16, 2012 | Nov. 17 – Dec. 31, 2012 | Year ended Dec. 31, 2013 | 6 months ended June 30, 2013 | 6 months ended June 30, 2014 |
|---|---|---|---|---|---|
| Total revenue | 340 | 109 | 6,170 | 1,925 | 10,065 |
| Total operating expenses | 12,657 | 4,346 | 57,508 | 23,108 | 74,044 |
| Net loss | (13,445) | (3,303) | (56,470) | (22,741) | (76,154) |
| Net loss attributable to NCIs | (1,771) | (699) | (62,108) | (2,307) | (88,688) |
| Net income available (loss attributable) to stockholder | (11,674) | (2,604) | 5,638 | (20,434) | 12,534 |
| Net income per share available (loss attributable) to common stockholder | (0.42) | (0.03) | 0.08 | (0.27) | 0.17 |

(Id. 67-68.) (All figures in thousands of dollars, except per share figures.)

Elsewhere, the Registration Statement provided the same data on a quarterly basis for the 18 month period that ended on June 30, 2014.

|  | Mar. 31, 2013 | June 30, 2013 | Sep. 30, 2013 | Dec. 31, 2013 | Mar. 31, 2014 | June 30, 2014 |
|---|---|---|---|---|---|---|
| Total revenue | 592 | 1,333 | 2,274 | 1,971 | 3,507 | 6,558 |
| Total operating expenses | 10,294 | 12,814 | 15,732 | 18,668 | 33,367 | 40,677 |
| Net loss | (10,780) | (11,961) | (14,993) | (18,736) | (36,543) | (39,611) |
| Net loss attributable to NCIs | (2,121) | (186) | (37,848) | (21,953) | (43,584) | (45,104) |
| Net income available (loss attributable) to stockholder | (8,659) | (11,775) | 22,855 | 3,217 | 7,041 | 5,493 |

(Id. 99.)  (All figures in thousands of dollars.)

The Registration Statement included "a chronology of some of [Vivint Solar's] key corporate milestones," which included the number of solar energy systems installed (2,669 in 2012, 10,521 in 2013, and 8,624 for the first six months of 2014), the rate of installation (51 systems per week in 2012, 202 systems per week in 2013, and 332 systems per week in the first six months of 2014), and aggregate capacity of all installed systems (14.8 megawatts at the end of 2012, 72.8 megawatts at the end of 2013, and 129.7 megawatts at the end of the first six months of 2014).  (Id. 71.) These "milestones" largely overlapped with the four "key operating metrics" the Company identified elsewhere in the Registration Statement: "solar energy system installations;" "megawatts installed and cumulative megawatts installed;"

11

"estimated nominal contracted payments remaining;"[8] and "estimated retained value."[9]  (Id. 77-79.)

The Statement also disclosed and explained the role of the 10 Investment Funds, through which investors had "committed to invest approximately $543 million," which would "enable [the Company] to install solar energy systems [worth] approximately $1.3 billion, of which approximately $913 million ha[d] been installed."  (Id. 72.)  The Statement went on to explain the role of the funds in greater detail:

> [Vivint Solar] contribute[s] or sell[s] the solar energy systems, customer contracts, and associated rights to the investment funds and receive[s] cash and an equity interest in the fund. … The cash contributed by the fund investor is used by the investment fund to purchase the solar energy systems developed by [the Company].  The investment funds own the solar energy systems, customer contracts and associated rights, and the monthly payments from customers are made directly to the investment funds. … [The Company] use[s] the cash received from the investment funds to cover [its] variable and fixed costs associated with installing the related solar energy systems.

(Id. 73-74.)

The Registration Statement also provided information about how the Funds impacted the Company's accounting.  Vivint Solar, it explained, "consolidate[s] the assets and liabilities and operating results of these partnerships in [its] consolidated financial statements," and "recognize[s] the fund investors' share of the

---

[8] "[T]he sum of remaining cash payments that our customers are expected to pay over the term of the agreements with us for systems installed as of the measurement date."  (RS 78.)

[9] "[T]he net cash flows we expect to receive from customers pursuant to long-term customer contracts … but which are not yet recognized on our financial statements."  (RS 79.)

net assets of the investment funds as [NCIs] in [the Company's] consolidated

balance sheets." (Id. 76.)

Although the investment funds' results were consolidated on the Company's

balance sheets, the Company's financial statements divided net gain or loss into a

portion available/attributable to NCIs and a portion available/attributable to

common stockholders.  (Id. 88-91.)  It did so by calculating the loss attributable to

NCIs and subtracting it from the Company's net loss.  (Id. 88.)  The loss attributable

to NCIs was calculated using the HLBV method and "reflect[ed] changes in the

amount the fund investors would hypothetically receive at each balance sheet date

under the liquidation provisions of the contractual agreements of these funds."  (Id.

88-89.)  During every time period reported in the Statement, the Company had

posted a net loss and subtracting the loss attributable to NCIs had either reduced

the loss attributable to common stockholders or turned the Company's recorded net

loss into income available to common stockholders.  (Id. 67-68, 99.)

The Registration Statement also warned that, under the HLBV method, "the

impact on [NCIs] may vary significantly period-to-period depending on," among

other things, "the timing of an investor's cash contribution to the investment fund

relative to the timing of the contribution or sale by [the Company] of the solar

energy system to the applicable investment fund."  (Id. 90-91.)  The Statement

explained:

> A portion of the solar energy systems purchased by, or contributed to,
> an investment fund [using investors' cash contributions] are not
> installed at the time of purchase or contribution and therefore do not
> have any carryover basis allocated to them.  [The Company's] wholly

13

owned subsidiary has an obligation to purchase, install, and provide the solar energy system equipment to an investment fund for any in-progress projects that were previously purchased by such fund. … [T]he portion of the cash purchase price paid by an investment fund that relates to in-progress projects [is] recorded as a receivable by the investment fund (i.e., representing the investment fund's right to receive solar panels and related equipment for solar energy systems that are installed after the project is purchased by the investment fund). Given that [Vivint Solar's] subsidiary controls the investment fund, we have accounted for the receivable balance (i.e., the entire cash balance paid to our subsidiary for the purchased, uninstalled solar energy systems) as a reduction in the investment fund's members' equity in accordance with GAAP. Initially, this results in the allocation of losses amongst the partners, primarily to the fund investor, because the GAAP equity balance is less than the tax capital account. When such solar energy systems are subsequently installed, the systems are recorded at their carryover basis as a common control transaction and the receivable balance is eliminated. With the elimination of the receivable, the investment fund's member's equity is increased to the extent of the carrying amount of the assets contributed which results in the reversal of a portion of the prior allocation of losses.

(Id. 90.)

In the Notes to Consolidated Financial Statements section of the Registration Statement, the Company provided a breakdown of the aggregate value of the Investment Funds' assets and liabilities. (Id. F-44.) The following table provides a selection of the data:

|  | Dec. 31, 2012 | Dec. 31, 2013 | June 30, 2014 |
|---|---|---|---|
| **Assets** |  |  |  |
| Total current assets | 995 | 3,636 | 8,091 |
| Solar energy stems, net | 33,437 | 152,565 | 308,130 |
| Total assets | 34,432 | 156,201 | 316,221 |
| **Liabilities** |  |  |  |
| Total liabilities | 171 | 2,916 | 5,899 |

(Id.) (All figures in thousands of dollars.)

14

C.      <u>Third Quarter Results</u>

The third quarter of 2014 ended on September 30, 2014, the day before Vivint

Solar's IPO.  (SAC ¶ 31.)  During that quarter the Company installed 6,935 solar

energy systems with a capacity of 49 megawatts, bringing the total cumulative

capacity of its systems to 178 megawatts.  (Nov. 10, 2014 Form 8-K,[10] at 5, 12.)  The

Company's estimated nominal contracted payments remaining and estimated

retained value both also increased, by $195 million and $89 million respectively.

(<u>Id.</u>)  However, the net loss attributable to stockholders per diluted share was

($0.45).  (<u>Id.</u> 6).  The table below presents some of the Company's third quarter

financial results.

|  | 3 Months ending Sept. 30, 2014 |
|---|---|
| Total revenue | 8,333 |
| Total operating expenses | 66,690 |
| Net loss | (51,693) |
| Net loss attributable to NCIs | (16,415) |
| Net income available (loss attributable) to stockholder | (35,278) |
| Net income per share available (loss attributable) to common stockholder | (0.45) |

(<u>Id.</u> 10.)  (All figures in thousands of dollars, except per share figures.)

---

[10] The notation "Nov. 10, 2014 Form 8-K" refers to Vivint Solar's  Nov. 10, 2014 Form 8-K filing with the SEC and its attached exhibits.  The form and exhibits are available as ECF No. 66, Exh. E.

The Investment Funds' balance of assets and liabilities also shifted.  The table below presents some of the balance sheet information as of the end of the third quarter.

|  | Sept. 30, 2014 |
| --- | --- |
| **Assets** | |
| Total current assets | 10,674 |
| Solar energy stems, net | 408,035 |
| Total assets | 418,709 |
| **Liabilities** | |
| Total liabilities | 6,461 |

(SAC ¶ 40.)  (All figures in thousands of dollars.)

The third quarter results were not included in the Registration Statement that preceded Vivint Solar's IPO or otherwise disclosed prior to the IPO.

D.    Other Developments

1.    Installation Delays

Plaintiff alleges that, prior to the IPO, Vivint Solar was facing significant delays in its installation of solar energy systems.  (SAC ¶ 43.)  He has rounded up a group of former Vivint Solar employees to "confirm that the Company was not installing its solar energy systems on a timely basis."  (Id. ¶ 44.)  The five former employees had all been based in California.  (Id. ¶ 44-45.)  Four worked for Vivint Solar both before and after the IPO and recounted delays due to, inter alia, insufficient training time for new hires, permitting delays, technician inexperience, and a mid-2014 change in the mounting systems the Company used.  (Id. ¶ 44.)  The fifth, who left the Company before the IPO, asserted that "Vivint Solar and its executive management were aware of the installation delays" and recounted reports

16

of the delays that management received and internal systems and tools that the Company used to track installations and other account statuses.  (Id. ¶¶ 45-47.)

      2.   <u>Hawaii</u>

Plaintiff alleges that prior to Vivint Solar's IPO Hawaii had already begun "instituting regulations aimed at slowing and/or decreasing solar energy generation." (SAC ¶ 82.)  In particular, plaintiff notes that because oversaturation of residential rooftop solar energy systems posed a threat to the operations and safety of the electric grid, the local utilities had already proposed major regulatory changes to net metering and maintenance charges "approximately one month before the Registration Statement went effective." (Id. ¶ 84.)  Plaintiff asserts that "[t]he effects of Hawaii's tightening regulations," including a decrease in the number of people employed in the state's solar energy sector and the number of permits issued for new rooftop solar energy systems, "have been noticed, and well-documented." (Id. ¶ 86.)  Plaintiff also alleges that "[t]he true state of the Hawaiian solar energy market did not become evident until the Company released its quarterly financials for the third quarter of fiscal 2014 in a press release issued after the market closed on November 10, 2014 and the Company's quarterly report on Form 10-Q after the market closed on November 12, 2014." (Id. ¶ 92.)

      3.   <u>Consumer Preferences</u>

Plaintiff alleges that, at the time of Vivint Solar's IPO, the solar energy market was experiencing a "shifting preference for outright purchasing and/or financing of solar energy systems (as opposed to long-term leases and power

purchase agreements)." (SAC ¶ 66.)  This changing preference, plaintiff argues, was "evident." (Id. ¶ 67.)  For example, a June 2014 report by GTM Research noted that "[t]hird-party ownership (TPO) is still the dominant model for financing a residential solar installation, but direct ownership via loans and other mechanisms is gaining traction as a result of lower system costs, changing consumer preferences, and improved options offered by the industry's leading players." (GTM[11] 5.)  The report noted that "the trend over the past several years ha[d] clearly been a rapid rise in the deployment of TPO solar," but that "this share has leveled off or even decreased in most … states in the past year." (Id. 18.)  The report forecasted that "the share of TPO solar in the residential market … is expected to grow slightly this year [2014] and then begin declining." (Id. 31.)

Plaintiff also cited a November 2014 report by the U.S. Department of Energy's National Renewable Energy Laboratory (SAC ¶¶ 68-70) that predicted that "solar loans will increasingly capture market share relative to the TPO model in the coming years." (NREL[12] vi.)  This report explained that, although third-party systems were dominant in the distributed solar energy market, "comprising approximately 60% to 80% of residential systems installed in California, Arizona, and Massachusetts – three of the top U.S. residential markets," "in the last two

---

[11] The notation "GTM" refers to GTM Research's June 2014 report entitled 'U.S. Residential Solar Financing 2014-2018.'  The report is available as ECF No. 66, Exh. C.

[12] The notation "NREL" refers to the National Renewable Energy Laboratory's November 2014 report entitled 'Banking on Solar: An Analysis of Banking Opportunities in the U.S. Distributed Photovoltaic Market.'  The report is available as ECF No. 66, Exh. D.

years, another solar financing option [had become] commensurately competitive and ha[d] begun to capture market shares: loans." (Id. 15, 11.)

Plaintiff also recounted that two former employees of the Company, both of whom worked for the Company before and after the IPO, reported "losing a considerable amount of customers" because "Vivint Solar was unable to offer a direct purchasing option for the solar energy systems." (SAC ¶ 71.) These former employees respectively estimated the loss at 15-20% and 5-10% of potential customers. (Id.)

Plaintiff further alleges that "Vivint Solar's largest competitor, SolarCity, was aware of the shift in the marketplace" and responded by offering a loan option starting in October 2014. (Id. ¶ 72.) Finally, plaintiff alleges that the changes in customer preference "did not become evident until the Company released its quarterly financials for the third quarter of fiscal 2014 in a press release issued after the market closed on November 10, 2014." (Id. ¶ 73.)

E.   The IPO and Subsequent Trading

Vivint Solar held its IPO on October 1, 2014. (SAC ¶ 29.) The Company sold 20.6 million shares of its common stock at $16.00 per share, resulting in net proceeds of $300.8 million after deducting underwriting discounts and commissions and $8.6 million in offering expenses. (Id.)

On October 1, 2014, plaintiff purchased a number of shares of Vivint Solar's common stock. (ECF No. 24, Exh. A.) He purchased these shares at prices ranging from $16.40 to $16.80. (Id.)

On November 10, 2014, Vivint Solar issued a press release disclosing its third-quarter financial results and fourth-quarter guidance.  (SAC ¶ 92.)  The Company disclosed the financial results discussed above and predicted that the fourth quarter would see fewer installations (45-47 megawatts, compared with 49 megawatts) and lower total revenue ($5.5-6.5 million, compared with $8.3 million) than the third quarter.  (Id. ¶ 93-94; Nov. 10, 2014 Form 8-K 6-7.)  The Company also predicted a decline in total operating expenses, from $66.7 million in the third quarter to $47-51 million in the fourth.  (Nov. 10, 2014 Form 8-K 6-7.)

Vivint Solar stock, which had been trading at $14.74 per share on November 10, 2014, declined to $11.42 per share on November 11, 2014.  (SAC ¶ 97.)  This $3.32 per share decline was approximately 22.5% of the stock's value.

On November 12, 2014, Vivint Solar issued its quarterly report on Form 10-Q.  (Id. ¶ 92.)  Among other facts, the report disclosed that at the close of the third quarter of 2014, "approximately 12% of … Vivint Solar's cumulative installations were in Hawaii, down from 15% as of June 30, 2014."  (Id. ¶ 95.)

The Company's stock, which had been trading at $12.33 per share on November 12, 2014, declined to $11.70 per share on November 13, 2014.  (Id. ¶ 99.) This $0.63 per share decline was approximately 5% of the stock's value.

II.     LEGAL PRINCIPLES

      A.     The Standard on a Motion to Dismiss

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id.  The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  Knowledge and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).  A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010).  But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal

21

is appropriate.  <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>,

556 U.S. at 679).  Where necessary, the Court may supplement the allegations in

the complaint with facts from documents either referenced therein or relied upon in

framing the complaint.  <u>See</u> <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d

Cir. 2010).

 For purposes of ruling on this motion to dismiss a Securities Act claim, also

considers the Securities and Exchange Commission filings that plaintiff references

in the operative complaint.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551

U.S. 308, 322 (2007); <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d

Cir. 2007).

 **B.** <u>Liability Under §§ 11, 12(a)(2), and 15 of the Securities Act</u>

 "Sections 11 and 12(a)(2) of the Securities Act impose liability on certain

participants in a registered securities offering when the registration statement or

prospectus contains material misstatements or omissions."  <u>Panther Partners Inc. v.</u>

<u>Ikanos Commc'ns, Inc.</u>, 681 F.3d 114, 119 (2d Cir. 2012) (citing 15 U.S.C. §§ 77k,

77*l*(a)(2)).  "Section 11 imposes strict liability on issuers and signatories, and

negligence liability on underwriters, in case any part of the registration statement,

when such part became effective, contained an untrue statement of a material fact

or omitted to state a material fact required to be stated therein or necessary to

make the statements therein not misleading.  Section 12(a)(2) imposes liability

under similar circumstances for misstatements or omissions in a prospectus.  And §

15 imposes liability on individuals or entities that control any person liable under

§§ 11 or 12." Id. at 120 (alterations, citations, and internal quotation marks omitted).  Sections 11 and 12 are "Securities Act siblings with roughly parallel elements."  In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 359 (2d Cir. 2011).  Neither scienter, reliance, nor loss causation is an element of a claim under §§ 11 or 12(a)(2).  Panther Partners, 681 F.3d at 120.  Thus, unless the allegations in the complaint are premised on fraud,[13] a Securities Act plaintiff faces only "a relatively minimal burden" and need not satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Id. (quoting Litwin v. Blackstone, 634 F.3d 706, 716 (2d Cir. 2011)).

Under both §§ 11 and 12(a)(2) a plaintiff need only establish one of three bases for liability:  "(1) a material misrepresentations; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading."  Litwin, 634 F.3d at 715-716.  Plaintiff alleges each of these bases for liability.  (See ECF No. 71 at 17; SAC ¶¶ 110, 126.)

"Materiality is an inherently fact-specific finding that is satisfied when a plaintiff alleges "a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Litwin, 634 F.3d at 716-17 (internal quotation marks and citations omitted).  An omitted fact is material if

---

[13] The parties disagree as to whether plaintiff's allegations are premised on fraud.  Because plaintiff's complaint must be dismissed even under the "'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)," Morgan Stanley Info. Fund, 592 F.3d at 360, the Court does not need to resolve this question.

there is a substantial likelihood that the reasonable investor would view its inclusion as significantly altering the total mix of available information.  Id. at 717.

In considering whether alleged misrepresentations and/or omissions constitute violations of the securities laws, a court must read the offering documents as a whole.  Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996); see also Morgan Stanley Info. Fund, 592 F.3d at 366 ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety."); I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991).  The "central issue" a court considers in assessing sibling Securities Act claims "is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."  Olkey, 98 F.3d at 5 (quotation marks and alterations omitted).  Where "the risks of which plaintiffs complained were disclosed in the prospectus" – i.e., where a "reasonable investor" was informed "about the nature of the securities" – dismissal of the claims under Rule 12(b)(6) is appropriate. Steinberg v. PRT Grp., Inc., 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (citing Olkey, 98 F.3d at 9).

As discussed above, "[o]ne of the potential bases for liability under §§ 11 and 12(a)(2) is an omission in contravention of an affirmative legal disclosure obligation."  Panther Partners, 681 F.3d at 120.  Here, plaintiff alleges that the Company failed to meet a disclosure requirement imposed by Item 303 of SEC

24

Regulation S–K.  This Regulation obliges securities registrants to disclose, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Instruction 3 to the Item's paragraph 303(a) explains that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Item 303's disclosure duty exists "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011) (alterations in original) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Securities Act Release No. 6835, Exchange Act Release No. 26831, Investment Company Act Release No. 16,961, 43 S.E.C. Docket 1330 (May 18, 1989)).

III.    DISCUSSION

Plaintiff's basic contention is that the Company misled the market when it failed to disclose its true financial picture in its Registration Statement and instead waited until the post-IPO release of its third-quarter earnings to adequately clarify its position.  This premise is fundamentally flawed.

A.    <u>Earnings Swing</u>

Vivint Solar's third quarter ended September 30, 2014, the day before the IPO took place.  (SAC ¶ 1.)  Plaintiff alleges that, because the Company's net income per share in that quarter differed significantly from its net income per share in the previous four quarters, failing to include third quarter financial information was a material omission in violation of the Securities Act.  As discussed above, to be actionable plaintiff must adequately allege that the omission either contravened an affirmative legal disclosure obligation or made existing disclosures misleading.

Vivint Solar argues that it had no duty to report the third quarter results in the Registration Statement because the most recent financial information it reported, from the second quarter of 2014, was less than 135 days old, as required by SEC Regulation S-X.  <u>See</u> 17 C.F.R. § 210.3-12(a), (g)(1)(ii).  Plaintiff responds by citing cases in which compliance with the 135-Day Rule was not sufficient to meet a registrar's disclosure commitments.  Most notably, in <u>Shaw v. Digital Equipment Corp</u>, 82 F.3d 1194 (1st Cir. 1996), the First Circuit held that an issuer would be required to disclose "nonpublic information indicating that the quarter in progress at the time of the public offering will be an extreme departure from the range of results which could be anticipated based on currently available information."  <u>Id.</u> at 1210.  The question for the Court on this motion to dismiss, then, is whether, as a matter of law, the Company's third quarter results can be described as this type of extreme departure from anticipated range.

Careful examination of the Registration Statement and the third quarter results indicates that the latter were not an actionable "extreme departure." Although plaintiff focuses on the earning per share figure, it does not tell the whole story, and evaluating the broader financial data indicates that the volatility in net income available to stockholders and earnings per share derived not from a disastrous and unexpected shift in the Company's business but instead largely from the accounting methods that were fully disclosed in the Registration Statement.

In each of the six quarters for which specific financial information was provided in the Registration Statement, the Company operated at a net loss.  (RS 99.)  That quarterly net loss grew every quarter.  (Id.)  The Registration Statement disclosed these operating losses "since [the Company's] inception" and explicitly warned that the Company "expect[ed] to continue to incur net losses from operations."  (Id. 30.)

The same pattern held into the third quarter 2014 results: total revenue grew, but not as quickly as total operating expenses, and once again the Company experienced a record net operating loss.  (Nov. 10, 2014 Form 8-K, at 10.)  The third quarter net operating loss of $51.7 million compared with losses of $39.6 million, $36.5 million, $18.7 million, $15.0 million, $12.0 million, and $10.8 million in the previous six quarters.  (Id.; RS 99.)

Under the Company's disclosed accounting practices, translating net losses to net income available (loss attributable) to stockholders requires attributing some portion of the loss to the NCIs.  The Registration Statement explained that this

27

figure was calculated using the HLBV method and might "vary significantly period-to-period depending on," among other things, "the timing of an investor's cash contribution to the investment fund relative to the timing of the contribution or sale by [the Company] of the solar energy system to the applicable investment fund." (RS 90-91.)  The financial data disclosed in the Statement also indicated that the quarterly loss attributable to the NCIs was volatile: in the six quarters before the IPO, the amount had been $45.1 million, $43.6 million, $22.0 million, $37.8 million, $0.2 million, and $2.1 million.  (Id. 99.)  In the third quarter of 2014, the figure was $16.4 million.  (Nov. 10, 2014 Form 8-K, at 10.)

As described above, the net income available (or loss attributable) to stockholders was found by subtracting the net loss attributable to NCIs from the net operating loss.  In the four quarters prior to the IPO this amount was positive each quarter, although it reflected the variance in loss attributable to NCIs by not following a set pattern: the amounts were $5.5 million, $7.0 million, $3.2 million, and $22.9 million.  (RS 99.)  The two quarters before those had both seen negative results for stockholders, with attributable losses of $11.8 million and $8.7 million.  (Id.)  The third quarter of 2014 ended with a net loss attributable to stockholder of $35.3 million.  (Nov. 10, 2014 Form 8-K, at 10.)

In the appropriate context, therefore, the third quarter earnings were not the kind of "extreme departures" that impose a reporting requirement more stringent than the 135-Day Rule in SEC Regulation S-X.  Plaintiff is correct that the net income/loss attributable to stockholder varied dramatically between the second and

third quarters of 2014, but this variance reflected a known and disclosed volatility in the calculation of Vivint Solar's financial data.  It did not reflect a departure from the normal pattern of operations on the scale of the events that courts have determined create a specific duty to disclose new data.  See, e.g. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1210 (1st Cir. 1996) (reversing dismissal of claim where undisclosed quarterly loss was largest in over a year, "far greater than analysts had been expecting," and "bucked the positive trend of reduced losses under the company's new management," id. at 1200).

This legal conclusion is further supported by the Company's broader third quarter results.  As discussed above, the Registration Statement identifies four "Key Operating Metrics":  solar energy system installations; megawatts installed and cumulative megawatts installed; estimated nominal contracted payments remaining; and estimated retained value.  (RS 77-79.)  For the third quarter of 2014, each of these metrics had increased significantly since the second quarter of 2014 and was more than double the results of the third quarter of 2013.  (Nov. 10, 2014 Form 8-K at 12.)  The third quarter of 2014 was thus not an extreme departure for Vivint Solar, but instead one in which trends in the Company's fundamental metrics continued apace while the net loss attributable to NCIs, an accounting figure whose volatility was fully disclosed, experienced a sharp drop.

The same appraisal of the Company's Registration Statement and third quarter financial results demonstrates that the SAC fails to state a claim under Item 303 of Regulation S-K regarding the Company's earnings.  Item 303 is

29

explicitly concerned with "known trends or uncertainties … that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations."  Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011) (omissions in original) (quoting 17 C.F.R. § 229.303(a)(3)(ii)). Plaintiff has not alleged that the decrease in net loss attributable to NCIs between the second and third quarters of 2014 is a persistent trend that will materially impact the Company's revenues or income, much less that Vivint Solar reasonably expected it to be such a trend when it issued the Registration Statement.  See Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002) ("The first element of the Item 303 disclosure test … require[s] an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment.").  The fact that the Company's net loss attributable to NCIs increased back to $31.9 million in the fourth quarter of 2014 is further evidence that fluctuations in this accounting figure did not amount to a trend under Item 303.  (Mar. 3, 2015 Form 8-K[14] at 12.)

Plaintiff also argues that Item 303's requirement that registrar's "[d]escribe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations" required specific disclosure of the third quarter changes in the Investment Funds' assets and liabilities.  17 C.F.R. § 229.303(a)(3)(i).  He further

---

[14] The notation "Mar. 3, 2015 Form 8-K" refers to Vivint Solar's Mar. 3, 2015 Form 8-K filing with the SEC and its attached exhibits.  The form and exhibits are available as ECF No. 66, Exh. G.

alleges that failure to make this specific disclosure violated the standards of the Financial Accounting Standards Board ("FASB"), particularly the requirement to disclose subsequent events when the absence of such disclosure would render financial statements misleading.

Even accepting plaintiff's description of the relationship between the Funds' assets and the Company's earnings,[15] an increase in the Investment Funds' assets was not an unusual or infrequent event but instead the crux of how the Company had been funding itself and planned to continue to access capital.  The role of the Funds, including the fact that they would receive solar energy systems as assets upon their installation, was fully disclosed in the Registration Statement.  The fact that the specific amount by which the Funds' assets had grown in the quarter that ended the day before the IPO did not appear in the Statement did not make it materially incomplete or misleading.  Plaintiff's distaste for the Company's disclosed business model is not actionable.

B.     Installation Delays

At certain points in the SAC, plaintiff appears to conflate the issue of installation delays and third quarter earnings.  (See, e.g., SAC ¶ 43 ("[B]y October 1, 2014, Vivint Solar was also aware of its ongoing solar energy system installation delays and the impact that these delays would have on the Company's net loss and

---

[15] The Company strenuously disputes plaintiff's description of the relationship between these assets and NCI loss, but for the purposes of this motion to dismiss the Court accepts plaintiff's assertion that they are linked.  The Company also argues that plaintiff's arguments specifically related to the change in Investment Fund assets was not present in the SAC and appeared for the first time in plaintiff's opposition to the motion to dismiss; because plaintiff's argument is in all events unavailing, the Court need not determine whether it amounts to an improper attempt to amend.

31

earnings-per-share.  As explained by Vivint Solar in the Registration Statement, the HLBV calculation and, in turn, the Company's NCI loss, was affected by Vivint Solar's ability to timely install the solar energy systems it sold or contributed to the Investment Funds.").)  The SAC does not detail how a delay in installations would affect the financial statements the Company released before the IPO in a way that made them misleading.  Both the SAC and the Registration Statement explain that purchased but un-installed systems are reflected as a decrease in equity for the Funds' investors, and that the loss is reversed to the Company when installation is successful.  (Id. ¶¶ 43, 48; RS 90.)  Under this disclosed accounting treatment, any delay in installation would also delay any losses to the Company.  Thus, while an increased pace of installations in one period could conceivably increase the rate of losses in that period, the SAC contains no allegations of such a change in the delay rate.  Instead it alleges a consistent installation delay issue without explaining, even cursorily, how that alleged issue could affect the validity of the Company's financial statements.  In any event, as discussed above, the failure to disclose the third quarter earnings statement is not actionable, and thus, without more, neither is the failure to disclose the alleged reasons for those earnings.

The alleged installation delays might, however, be actionable as an undisclosed trend under Item 303.  The SAC cites former employees' accounts of losing customers based on frustration with installation delays.  (SAC ¶ 44.)  If these accounts disclosed a trend toward losing customers that was not otherwise

discernable from the information the Company published in the Registration Statement plaintiff they could conceivably provide a basis for liability under § 11.

In this case, the details of the alleged installation delays are not actionable. First, as discussed above, the Registration Statement identified the Company's "ability to complete installations in a timely manner" as a factor that "could cause [its] operating results to fluctuate." (RS 36.)   Moreover, only one of the former employees plaintiff references in the SAC recounted losing customers, and that employee did not directly state what percentage, if any, of those lost customers were due to installation delays.  (See SAC ¶ 44 ("FE 1 estimated that he lost approximately 40% of FE 1's customers throughout his employ with the Company.").)  The other employees recount lag times and the need for repairs but do not connect these events to any lost business, nor does plaintiff explain how this "trend" materially affected the Company's revenues or income.  This may be because the third quarter results that form the basis of plaintiff's claim related to earnings indicate that the Company installed both more systems and more megawatts in that quarter than any prior quarter, (Nov. 10, 2014 Form 8-K at 5, 12) an outcome inconsistent with the supposition that the Company faced a materially adverse installation trend of which it was aware and which it was obliged to disclose.

C.    Hawaii

Plaintiff's allegations that the Registration Statement failed to disclose material information about the Hawaii market ignores the Statement's specific

33

warnings about the risks of changing regulations.  As discussed above, the Registration Statement disclosed not only that "[t]echnical and regulatory limitations [might] significantly reduce [the Company's] ability to sell electricity from our solar energy systems in certain markets," but specifically discussed the existence of such limits in Hawaii, where limits had already "constrained [the Company's] growth" and further regulation "could result in limitations on deployment of solar energy systems in Hawaii, which accounted for approximately 15% of [the Company's] total installations as of June 30, 2014 and would negatively impact [the Company's] business."  (RS 24.)  Plaintiff argues that the apparent limitation of the existing regulations to "certain geographic areas" (Id.) rendered this disclosure incomplete, but a reasonable investor would have understood the Registration Statement to disclose exactly the risk that plaintiff highlights.

Additionally, plaintiff fails to adequately allege that any regulatory developments in Hawaii were material to Vivint Solar's revenues or income. Although plaintiff points out that the percentage of the Company's cumulative installations that were in Hawaii fell from 15% at the end of the second quarter of 2014 to 12% at the end of the third quarter and 10% at the end of the fourth, (SAC ¶¶ 98-101) he does not allege that the absolute number of installations in Hawaii dropped or even increased at a slower pace than before.  The SAC does not provide any explanation for the supposition that the Company growing faster in the rest of the country than in Hawaii was an adverse development.

34

D.    Consumer Preferences

Plaintiff's allegations regarding shifting consumer preference for solar financing (which Vivint Solar does not offer) rather than third party ownership of residential solar energy systems (Vivint Solar's business model) relies on two publicly available reports and the accounts of two former employees of the Company.  (SAC ¶¶ 66-71.)  At no point does the SAC allege that any of the statutory defendants of the claims under §§ 11 and 12(a)(2) were aware of the purported trend, much less that they "reasonably expect[ed]" such a trend to "have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," the basis for liability under Item 303.  17 C.F.R. § 229.303(a)(3)(ii).  "Knowledge of a trend is an essential element … under Item 303." In re Noah Educ. Holdings, Ltd. Sec. Litig., No. 08 Civ 9203(RJS), 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) (citing Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc., No. 07 Civ. 10528(RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010)).

The fact that one of the two reports plaintiff cites to document the trend in consumer preferences was published and available at the time of Vivint Solar's IPO cuts against his allegations of a material omission.  Although "in appropriate circumstances [the SEC's disclosure] requirement may extend to certain trends that are not firm-specific or are publicly available," Kapps v. Torch Offshore, Inc., 379 F.3d 207, 215 (5th Cir. 2004), "as a general matter, the 'total mix of information may include information already in the public domain and facts known or

35

reasonably available to potential investors.'" Litwin v. Blackstone Grp., L.P., 634
F.3d 706, 718 (2d Cir. 2011) (internal quotation marks, omission, and alteration
omitted) (quoting United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d
1190, 1199 (2d Cir. 1993)).  This publicly available report, moreover, did not predict
doom for the Company's business model; instead, it predicted that the total number
of solar systems installed per year would increase until at least 2016, that the total
number of third-party owned solar systems installed per year would increase until
at least 2016, and even that the percentage of solar system installations per year
that were third-party owned would continue to increase until at least 2014.  (GTM
32.)  The report was thorough and put into context its evaluation that "direct
ownership via loans and other mechanisms [was] gaining traction."  (Id. 5.)  That
context undercuts efforts to paint consumer preferences as a trend that could be
reasonably expected to materially impact the Company's revenues or income.
Therefore, even if the SAC had adequately alleged knowledge of this trend on the
part of defendants, this trend would still not be actionable under §§ 11 and 12(a)(2).

     E.     Additional Reasons for Dismissal

     As discussed above, the Company's Registration Statement did not contain
an untrue statement of a material fact or omit a material fact or otherwise required
disclosure.  Plaintiff has therefore failed to state a claim for relief under § 11 of the
Securities Act.  It follows that he has failed to state a claim for liability under §§
12(a)(2) and 15.  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359
(2d Cir. 2010) ("Claims under sections 11 and 12(a)(2) are … Securities Act siblings

with roughly parallel elements."); id. at 358 ("[T]he success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12."); New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Supp. 2d 254, 268 (S.D.N.Y. 2010) ("The analysis of claims made pursuant to section 11 and section 12(a)(2) is essentially the same.").

Some of plaintiff's claims, however, would be properly dismissed even if the SAC stated a claim upon which relief can be granted under § 11. The Court discusses two of these alternative bases below.

      1.   Blackstone

The only claim against Blackstone in the SAC is Count I, the claim for a violation of § 11 of the Securities Act.[16]  (SAC ¶¶ 109-20.)  The other two counts, for violations of §§ 12(a)(2) and 15, are directed at the "Underwriter Defendants" and the "Individual Defendants," respectively.  (Id. pp. 42, 44.)  The portion of the SAC that introduces the parties defines the "Individual Defendants" and "Underwriter Defendants" not to include The Blackstone Group L.P.  (Id. ¶¶ 22-23.)

Although plaintiff's only allegation against Blackstone is for a violation of § 11, Blackstone is not a statutory defendant under that section.  The statute creates a cause of action against persons who signed the offending registration statement; persons who were then, or were about to become, directors of or partners in the

---

[16] Even this count is debatable: the heading mentions "The Defendants" without limitation, while the count's specific allegations conclude that "Vivint Solar, the Individual Defendants, and the Underwriter Defendants have violated Section 11 of the Securities Act."  (Id. at p.41 & ¶ 120.)  As discussed further below, the SAC distinguishes between Vivint Solar and Blackstone (id. ¶¶ 16-17) and defines the "Individual Defendants" and "Underwriter Defendants" not to include The Blackstone Group L.P.  (Id. ¶¶ 22-23.)

issuer; professionals who consented to be named as having prepared or certified the offending registration statement or a report used in connection with it; and underwriters.  15 U.S.C. § 77k(a).  The SAC does not and could not allege that Blackstone fits any of these categories.  Blackstone would therefore have to be dismissed as a defendant even if plaintiff stated a claim under any of the three counts in the SAC.

   2. 12(a)(2) Standing

  Section 12(a)(2) only provides a cause of action against a plaintiff's "statutory seller," the person who either "passed title, or other interest in the security, to the buyer for value," or "successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."  Morgan Stanley Info. Fund, 592 F.3d at 359 (alterations omitted) (quoting Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988)).  Section 12's liability reaches "only the buyer's immediate seller; … a buyer cannot recover against his seller's seller."  Pinter, 486 U.S. at 644 n.21.  Robby Shawn Stadnick, the lead plaintiff in this case, is not alleged to have purchased his shares of Vivint Solar's common stock directly from the Underwriter Defendants he alleges violated Section 12(a)(2).  (See SAC ¶ 15.)  Indeed, he represents that he bought his shares at prices above the $16.00 offering price in the IPO, which necessarily means that he did not buy through the initial public offering itself.  (ECF No. 24, Exh. A.)  He therefore lacks standing to bring a claim under Section 12(a)(2) against the

Underwriter Defendants.[17]  See, e.g. In re Fuwei Films Sec. Litig., 634 F. Supp. 2d

419, 445 (S.D.N.Y. 2009) ("[L]iability pursuant to section 12(a)(2) only attaches to

plaintiffs who purchased their shares directly in the initial public offering, and not

the so-called 'aftermarket.'").

　　　Plaintiff argues that he is nonetheless entitled to maintain the Section

12(a)(2) claims on behalf of unnamed class members.  The basis for plaintiff's

argument is the Second Circuit's decision in NECA-IBEW Health & Welfare Fund

v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012).  Plaintiff interprets NECA-

IBEW to stand for the proposition that because he shares the "same set of concerns"

as those who purchased directly in the offering, he is entitled to represent them.

　　　The Court has found that NECA-IBEW is frequently misread, usually, as

here, in an attempt to create standing where standing does not exist.  It does not

stand for the sweeping proposition that an individual may represent absent class

members with regard to claims as to which he or she has no individual standing,

although that is how it is now sometimes cited.  Instead, NECA-IBEW invoked

principles of standing to help determine whether the claims of a present class

member with standing were sufficiently close to the claims of absent class members'

claims to maintain the action on a representative basis.

　　　In NECA-IBEW, the Second Circuit partially vacated a district court's

dismissal of certain claims brought pursuant to §§ 11, 12(a)(2), and 15 of the

---

[17] Nor is this lack of standing a defect that is unique to Mr. Stadnick.  Neither of the other two potential lead plaintiffs allege that they purchased their shares directly from the Underwriter Defendants, (ECF Nos. 21, Exhs. 2,3; 27, Exhs. B,C), nor did either of the individuals who filed the initial complaints that have been consolidated in this action.  (ECF No. 1 in case 14-cv-9283; ECF No. 1 in case 14-cv-9709.)

Securities Act.  693 F.3d at 167-68.  Defendants had issued and underwritten mortgage-backed certificates in 17 separate offerings, all of which relied on the same Shelf Registration Statement but each of which had been associated with a separate Prospectus Supplement.  Id. at 148-49.  Plaintiff had purchased certificates in two of the offerings but sought to assert class claims on purchasers of all 17.  Id. at 149.  Although all purchasers were subject to the alleged misrepresentations in the sole Shelf Registration Statement, the district court only allowed plaintiff to represent persons or entities that purchased certificates in the two offerings from which plaintiff had purchased its shares.  Id. at 154-55.

The Second Circuit noted that plaintiff had both "Article III standing to sue defendants in its own right" and "statutory standing [under §§ 11 and 12(a)(2) of the Securities Act] in its own right."  Id. at 158.  Whether plaintiff had "class standing," however, turned on further considerations.  The Second Circuit surveyed the Supreme Court's pronouncements on the subject, which it concluded "stand collectively for the proposition that, in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  Id. at 162 (omission in original) (internal quotation marks and citation omitted).  The Second Circuit therefore focused on the similarities and differences between the harm the plaintiff claimed to have suffered and the claims other putative class

members would claim.  The certificates plaintiff purchased were based on loans originating with two lenders, and the Second Circuit concluded that plaintiff could stand as class representative for all purchasers of certificates containing loans from those lenders, but not for purchasers of certificates containing loans originating with other lenders.  Id. at 163-64.  Thus, plaintiff could represent a class of purchasers from seven of the offerings, but not from all 17.

In the instant case, plaintiff's position is significantly different from that of the plaintiff in NECA-IBEW.  As discussed above, plaintiff here does not have statutory standing on his own right to pursue a claim under § 12(a)(2).  Rather than expanding from his own statutory standing to represent a class of people with the same set of concerns, plaintiff instead asserts merely that the similarity between claims under § 11 and claims under § 12(a)(2) is enough.  It is not, and plaintiff's lack of statutory standing for a § 12(a)(2) claim is dispositive.  See Police & Fire Ret. Sys. of the City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95, 112 ("[T]here must be a named plaintiff sufficient to establish jurisdiction over each claim advanced.").

IV.    CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is GRANTED. The action is dismissed with prejudice.  Plaintiff was previously provided with the opportunity to amend its pleading, and has done so.  Plaintiff has not suggested any facts it might include in a further amendment that would resolve the deficiencies in the SAC.

The Clerk of Court is directed to amend the captions in this matter to match the caption above, terminate the motions at ECF Nos. 64 and 67, and terminate these actions.


SO ORDERED.

Dated:        New York, New York
              December 10, 2015

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge